# GARNETT Y. CLARK

## *vs.*

## JAMES BOOKER CLARK ET AL.

*Constructive Trust—Ratification of Agent's Act.*

Where the purchase money for property is paid and the title taken by the same person, there is no resulting trust.  p. 41

If one bidding on and buying certain property induced another, assuming to represent a third person, but without actual authority for the purpose, to refrain from bidding, by undertaking to buy the property on joint account, such third person, if he desires to ratify and adopt the arrangement entered into in his behalf, must, within a reasonable time, offer to contribute his proportion of the price of the property.  p. 43

The party filing a bill of complaint has the burden of proving its allegations.  p. 44

That certain bonds of a face value of $18,000 were sold to defendant for $500 *held* not sufficient corroboration of the statement of plaintiff's single witness that defendant promised the witness to buy the bonds for the joint account of plaintiff and defendant, the latter testifying that he made no such promise, and there being no evidence as to the value of the bonds.  p. 44

*Decided June 28th, 1921.*

Appeal from the Circuit Court from Howard County, in Equity (FORSYTHE, J.).

Bill by Garnett Y. Clark against James Booker Clark and the Brandenburg Coal Mining Company, asserting a trust in certain bonds. From a decree for defendants plaintiff appeals. Affirmed.

The cause was argued before BOYD, C. J., BRISCOE, THOMAS, PATTISON, URNER, STOCKBRIDGE, ADKINS, and OFFUTT, JJ.

*George M. Brady,* with whom were *Maloy, Brady, Howell & Yost* on the brief, for the appellant.

*James Clark* and *James U. Dennis,* for the appellees.

Offutt, J., delivered the opinion of the Court.

The appellant and the appellee in this case are brothers. They were at one time interested in the Pennwood Coal Company, which operated a coal mine at Rockwood, Pennsylvania. That company failed and Garnett Y. Clark, J. Booker Clark, William J. O'Brien, Lemuel R. Brandenburg and George Dobbin Penniman, under an arrangement with its bondholders, bought in the property at the receivers' sale. They organized a new company under the name of the Brandenburg Coal Mining Company, and issued to the bondholders of the Pennwood Coal Company bonds of the new company for the bonds of the old company which they held. Then, in order to take care of the receivership and other expenses incident to the reorganization and to the operation of the new company, they borrowed, on a promissory note payable on demand, executed by Brandenburg and endorsed by Messrs. O'Brien and Penniman and the two Clarks, and secured by the stock held by Brandenburg and forty thousand dollars par value of the bonds of the new company as collateral, twenty-five thousand dollars from the Baltimore Trust Company. Some time after that the trust company called the loan, and was told to sell the collateral. It did that, and at the sale the collateral was bought in by the Messrs. Clark, Mr. O'Brien and Mr. Penniman, for $5000, each of whom then held a one-fourth equal share of the collateral so bought in. They then executed a new note to the trust company, signed by the four men last named, secured by the same collateral and for the sum of twenty thousand dollars. This note was dated May 2nd, 1912. Later Mr. O'Brien paid $5000 on account of this loan and was released from further liability thereon, and later still Mr. Penniman paid $5000, and was also released from further liability. Each of them, however, left his

share of the Brandenburg Coal Mining Company's bonds as collateral to secure the payment of the balance of ten thousand dollars and interest due on account of the loan, which was evidenced by renewals of the original note, the renewal notes being in each case demand notes. This note remaining unpaid, the trust company notified Mr. O'Brien, who was the secretary of the Coal Company, that they were about to sell the collateral, and they did advertise and offer it for sale at the auction rooms of Messrs. Pattison & Gahan in December, 1916. Garnett Y. Clark was not in Baltimore at that time, but the sale was attended by J. Booker Clark and Mr. O'Brien. Mr. O'Brien went to look after the interests of Garnett Y. Clark. Just what took place on that occasion between Mr. O'Brien and Mr. J. Booker Clark is the subject of directly conflicting testimony. Mr. O'Brien said he was told by J. Booker Clark that he, Clark, proposed to buy the bonds for Garnett Clark and himself, "half and half," and that therefore there was no reason for Mr. O'Brien, who was interested in protecting Garnett's interests, to bid on them, and that he then told Clark that, as a result of that assurance, he would not bid, and that the bonds were sold to J. Booker Clark for $500. J. Booker Clark on the other hand said that he had no such conversation, that he went to the sale to protect his own interests, and so informed Mr. O'Brien, who did bid on the bonds. J. Booker Clark, however, failed to turn over any part of the bonds to Garnett Clark, and the latter, on May 25th, 1920, filed the bill in this case for the purpose of obtaining what he claimed to be his half of the bonds so bought by his brother, on the theory that his brother acquired and held them in trust for him. J. Booker Clark in due course answered the bill, testimony was taken, and the case having been submitted for final decree, the bill was dismissed and this appeal taken from that decree.

The appeal presents two questions, one of law and one of fact, the first being whether, if the facts asserted by Garnett Y. Clark, to which we have referred, are true, the appellee

held the bonds he acquired in trust for himself and the appellant, and the second, whether the allegations of the bill of complaint are supported by the proof in the case.

The first question before us then is whether, if the facts asserted by the appellant are true, the appellee holds the bonds he acquired at the sale in trust for himself and his brother. "Trusts are divided * * * into direct or express trusts, implied, resulting, and constructive trusts. Direct or express trusts are created by the direct or express words of a grantor or settlor. Implied, resulting, and constructive trusts arise by operation of law upon the transactions of the parties." 1 *Perry, Trusts* (6th ed.), sec. 73. Manifestly this was not an express trust, which is created by the express words of the vendor or settlor, nor an implied trust, where it is inferred from all the circumstances of the transaction that the parties intended to create a trust. *Ibid.* Secs. 73, 112. Nor can a resulting or presumptive trust arise from these facts. Such a trust is presumed where one party pays the purchase money for property, the title to which is taken in the name of another. *Bouvier L. Dict.;* 1 *Perry* (6th ed.), *Trusts,* Sec. 124. And the payment of the purchase money by the person for whose benefit it is sought to establish the trust is an indispensable condition precedent to the existence of such a trust. Since the purchase money for the bonds under consideration was paid, and the title to them taken, by the same person, there could be no resulting trust in respect to them. The only class of trusts remaining is that of constructive trusts, which are also described as trusts *ex maleficio,* and are said to arise under the following circumstances: "If a person obtains the legal title to property by such arts or acts or circumstances of circumvention, imposition, or fraud, or if he obtains it by virtue of a confidential relation and influence under such circumstances that he ought not, according to the rules of equity and good conscience as administered in chancery, to hold and enjoy the beneficial interest of the property, courts of equity, in order to administer complete justice

between the parties, will raise a trust by construction out of such circumstances or relations; and this trust they will fasten upon the conscience of the offending party and will convert him into a trustee of the legal title, and order him to hold it or to execute the trust in such manner as to protect the rights of the defrauded party and promote the safety and interests of society. Such trusts are called *constructive* trusts. They differ from other trusts in that they are not within the intention or contemplation of the parties at the time the contract is made from which they are construed by the court, but they are thrust upon a party contrary to his intention and against his consent." 1 *Perry, Trusts* (6th ed.), Sec. 166; *Coyne* v. *Supr. Concl.,* 106 Md. 58. "As where a purchaser fraudulently agrees that he will purchase an estate in his own behalf and that of another, in order to prevent competition, and gets the property into his own name at a less price he will be a trustee for the person defrauded." *Ibid.* Sec 172; *McCulloch* v. *Comher,* 5 *Watts & S.* (Pa.) 427; *Ferguson* v. *Williamson,* 20 Ark. 272; *Owson* v. *Cown,* 22 Miss. 329. All such trusts, so called, rest upon some fraud, actual or constructive, practiced upon the person claiming the benefit of the trust by the person sought to be charged. *Suman* v. *Harvey,* 114 Md. 256; *Ruhe* v. *Ruhe,* 113 Md. 601; 26 *R. C. L.* 1236.

And if the statements or promises, which Mr. O'Brien testified J. Booker Clark made to him, were actually made to Garnett Clark, or his agent, and he was thereby misled to his detriment, and if, within a reasonable time after hearing that they had been made, he had elected to adopt the arrangement said to have been made between Mr. O'Brien and J. B. Clark, and had tendered his part of the purchase price of the bonds, it might well be said that J. Booker Clark's conduct in refusing to deliver or account to him for any part of the bonds was tainted by fraud and that he held the bonds in trust for himself and the appellant. But that is not this case. Mr. O'Brien, when he attended the auction at which the

bonds were sold, had no authority from Garnett Clark to buy
them for him, and in making the arrangement which he says
he made with J. B. Clark he acted as a mere volunteer.

There is nothing to show that Garnett Clark intended to
bid on the bonds, or that he authorized any one else to bid
for him.  He was not therefore bound by the arrangement
made by Mr. O'Brien and J. B. Clark unless he subsequently
with knowledge of the facts, acquiesced in it, and ratified
and adopted it as the act of his duly authorized agent.  *White*
v. *Davidson,* 8 Md. 186-187; 21 *R. C. L.* 1919.  He could
not claim the benefit of a contract made under such circum-
stances without assuming its burdens too.  Under such cir-
cumstances it was clearly his duty, if he intended to stand on
the arrangement after learning what had been done, to have
informed the appellee within a reasonable time of his willing-
ness to contribute his proportion of the purchase price of the
bonds.  *Darcy v. Bayne,* 105 Md. 365.  Because even though
J. B. Clark had bought the bonds for himself and his brother
in equal shares, his brother could not reasonably expect to re-
ceive his proportion without paying or offering to pay his
proportionate part of the purchase price for them.  But his
brother neither then nor at any time offered to make such
contribution, or indeed spoke directly of the bonds to him at
all.  The most he did was to remain silent.  But even if we
assume that the facts alleged in the bill are sufficient to estab-
lish a constructive trust, we are unable to say that those
facts are established by the evidence in this case.  The exist-
ence of the alleged trust depends entirely upon what was said
between Mr. O'Brien and J. B. Clark at the auction room
where the bonds were sold, just prior to the sale.  There were
only two witnesses to that conversation, the parties to it, and
they disagreed wholly in their recollection of what was said,
and there was no corroborative testimony of any kind.
Neither witness can be said to have been entirely disinter-
ested.  J. B. Clark was clearly interested as a party to the
cause and as the holder of the bonds, claiming title thereto,

while Mr. O'Brien was interested as the attorney and agent of Garnett Y. Clark, if we accept his testimony.

It is contended by the appellant that Mr. O'Brien's testimony "was essentially corroborative in its nature and taken together with the allegations of the bill set up a *prima facie* case of fraud on the part of the defendant," but there was nothing for it to corroborate, as J. B. Clark and O'Brien were the only witnesses present at the interview at which it is alleged Clark made the statements which are the basis of the suit, and, as J. B. Clark flatly denied making them, Mr. O'Brien's testimony as to them is not corroborative, but is the only testimony in support of the appellant's version of what was said on that occasion. Nor are we aware of any principle under which the allegations of a bill of complaint must be assumed to be *prima facie* true on a final hearing, but the rule is just the other way, the party filing the bill is under the burden of proving its allegations. 21 *C. J.* 548. There was no question of confidential or fiduciary relations involved, nor is there anything in the record to show that the two brothers held the bonds jointly, but on the contrary the evidence does indicate that each of them held a certain number of the bonds in severalty, so that no presumption arises from the mere fact that J. B. Clark bought the bonds. Nor, in the absence of any definite proof of the value of the bonds, are we able to say that the price at which they sold affords sufficient corroboration of the testimony referred to. It does appear that the interest on them was unpaid from 1911 until shortly before this suit, and that the amount paid then was only $20 on each $500 bond, and that the bonds were twice offered at public sale, on the first occasion bonds of a par value of $40,000 were bought in by their owners for $5,000, that being the only bid, and on the other occasion bonds of a par value of $18,000 were bought in for $500, that being the highest bid.

It is true Mr. O'Brien said he thought they were worth fifty cents on the dollar, but he gave no facts to support that

estimate, such as the location, area and character of the property, the improvements thereon, or the quantity or quality of the coal which it contained, nor did it appear that he was sufficiently familiar with the value of such property to correctly estimate it. Under all the circumstances of the case, therefore, we are unable to say that Mr. O'Brien's uncorroborated testimony is sufficient to overcome that of the appellee, and since the plaintiff was bound to prove the allegations of the bill by a fair preponderance of the evidence, he failed to support that burden, and the decree appealed from must be affirmed.

In view of the conclusions we have reached, it becomes unnecessary to discuss the questions of limitations and laches referred to in the briefs.

*Decree affirmed, with costs.*