## ANNA DILLFELDER *v.* LENA WINTERLING.

*Trust Ex Maleficio—Conveyance on Fraudulent Promise.*

Evidence that plaintiff, while ill, conveyed property, largely acquired by her own labor, to defendant, her daughter, upon the latter's frequent requests, and her promise to reconvey it when asked to do so, plaintiff thereafter retaining possession of the property and deed, and paying the balance of a mortgage on the property and the expenses thereon, justified the recognition of a trust *ex maleficio in* favor of the mother, upon the daughter's refusal to make a reconveyance on request.

pp. 632-640

In view of defendant's refusal to reconvey, the decree for plaintiff should have ordered a reconveyance by defendant, rather than the cancellation of the plaintiff's deed to her. p. 641

*Decided June 9th, 1926.*

Appeal from the Circuit Court of Baltimore City (STEIN, J.).

Bill by Lena Winterling against Anna Dillfelder. From a decree for defendant, plaintiff appeals. Reversed.

The cause was argued before BOND, C. J., PATTISON, ADKINS, OFFUTT, DIGGES, PARKE, and WALSH, JJ.

*George Arnold Frick,* for the appellant.

*William N. Andrews* and *Arthur R. Padgett,* with whom was *Charles Jackson* on the brief, for the appellee.

PATTISON, J., delivered the opinion of the Court.

The property involved in this appeal, consisting of a leasehold interest in a' house and lot of land situated on 12th Street, in the City of Baltimore, was on the 8th day of Feb-

ruary, 1915, conveyed unto Charles A. Winterling and the
appellee, Lena Winterling, his wife, as tenants by the en-
tirety. They, with their children, occupied the property until
the death of the husband in nineteen hundred and seventeen.
Thereafter his widow, with her youngest daughter, Anna,
the appellant, continued to occupy it and are occupying it at
this time.

On the 7th day of July, nineteen hundred and twenty, the
mother, Lena Winterling, conveyed the property to her said
daughter. The latter in December, nineteen hundred and
twenty, five months after said conveyance to her, married
Frank Dillfelder. After her marriage, she, with her hus-
band, lived for seven months at the home of his parents,
when they returned to the home of her mother, where they
have both since lived.

On the 24th day of January, nineteen hundred and twen-
ty-four, Mrs. Winterling filed her bill in this case asking
that the deed from her to her daughter, executed on the 7th
day of July, nineteen hundred and twenty, be cancelled and
set aside.

The bill alleges "that during the summer of 1920, the
plaintiff was in ill health and the said defendant represented
to her that if she, the plaintiff, was in ill health, it would be
better to convey said property to her in order to avoid any
trouble or expense in the event anything should happen to
said plaintiff, and expressly promised that if the said plain-
tiff would convey the property to her, she would give it back
to her, the plaintiff, at any time she might want it; that
thereupon, pursuaded by the defendant's representations and
relying on and having faith in her promise to reconvey said
property on demand, the said plaintiff executed an assign-
ment, conveying said property to the defendant, who at
that time was known as Anna Winterling, being unmarried
* * *; that said plaintiff received no consideration from the
defendant or any one else for said conveyance"; that said
deed was recorded and the charge for same paid by the

plaintiff, but it was never delivered to the defendant and still remains in the possession of the plaintiff; that the defendant resided with her mother until her marriage on December 23rd, 1920, when she left her mother's home; "that when the property was originally acquired by the plaintiff and her husband, * * * a mortgage was placed thereon with the Canton Permanent Building Association, of Baltimore City, in the amount of eleven hundred dollars; that after the death of her husband, the plaintiff continued to pay off said mortgage, making her last payment December 5th, 1922, and has paid all the expenses, including ground rent, water rent, taxes, etc., due on said property; that the defendant has never paid one cent toward the purchase of said property or toward the expenses due thereon; that the said defendant has always recognized the plaintiff as the owner of said property and has never assumed any dominion over the same; that the plaintiff has demanded from the defendant a reconveyance of said property, but the defendant has refused and still refuses to convey same to the plaintiff, claiming that the plaintiff has no interest therein."

The defendant, Mrs. Dillfelder, filed her answer to the bill, averring that the deed was not executed at her request and that her mother was not in ill health at the time of its execution; that upon the direction of her mother, she went to work at the age of twelve years and continued thereat until she was married in nineteen hundred and twenty, at the age of nineteen years; that the money earned by her was given to her mother "except small sums which she was permitted to retain for her own use," that her mother promised her during those years to convey the property to her, "partly for the consideration of receiving her wages * * * and partly because the defendant was the plaintiff's youngest child and the one that remained longest with her, and who, the plaintiff said, had done the most for her, and because all the other children, consisting of one son and one daughter, had homes which they owned, while the defendant had none"; that at

the time of said conveyance the plaintiff said to the defendant, "This is now your home, keep it as long as you possibly can," warning her against any future husband securing control of it, saying that "it would be her home all her life"; that the "conveyance was absolutely voluntary and without any conditions attached to it and was so regarded by both the grantor and the grantee"; that upon her return to her mother, after living with the parents of her husband, as stated in the bill, she paid all operating expenses, "including the cost of the table, and the plaintiff took her meals with the defendant without paying therefor until she was moved to demand that the defendant convey back the property to her. Upon the defendant refusing to do so, the plaintiff, while continuing to live in the same house, furnished her own table"; that she made efforts to secure the possession of the deed to said property, but "obstacles were thrown in her way by her mother, the plaintiff." She averred in her answer "that she offered to pay off the mortgage, taxes and water rent, and tried to do so, but the plaintiff anticipated her." She denied therein that "she has always recognized the plaintiff as the owner of the property and that she has never assumed any dominion over the same." That "prior to moving back into the premises after her marriage, extensive repairs were made to the house through the labor of her husband, all materials used on the house being paid for by the defendant." She also averred that the plaintiff "has made many efforts through cajolery and coercion to induce the defendant to execute a deed to the said property, but that the defendant has always refused to do so, claiming the property as her own, but always permitting the plaintiff to live there, it being her intention to permit the plaintiff to live there during all the rest of her natural life."

The defendant also averred in her answer "that there was no trust attached to the conveyance to her by her mother of the property in question, and that she never at any time entered into any agreement, in writing or verbal, to recon-

vey the said property to the plaintiff." And concluded her answer by pleading "the Statute of Frauds."

The court, after hearing the evidence upon the issues joined, passed its decree cancelling and setting aside said deed. It is from that decree that this appeal has been taken.

The undisputed evidence is to the effect that the deed from Mrs. Winterling to her daughter was voluntary and without consideration and that the property conveyed thereby was acquired largely by the individual labor of the grantor; that at the time of her husband's death there was still owing upon the mortgage, placed thereon by herself and husband, a considerable sum, which was altogether paid by her, and much of it paid after the execution of the deed to her daughter. Not only was the mortgage debt paid by her, but she likewise paid all the ground rent, water rent, taxes and other expenses upon the property, both before and after the execution of said deed. The deed was recorded and the charge therefor paid by the grantor. It, however, was never delivered to the grantee, but the deed, as well as the property itself, has remained in the possession of the grantor, and whenever any part of the property has been rented, the rent received therefor has been paid to the mother without any objection or claim thereto made by the daughter.

The grantor testified that she was very fond of her daughter and loved her dearly. As she expressed it, "She was the love of my heart," and she wished her to have the property in question upon her death.

In the summer of 1920 she was in ill health and, though attempting to do her daily work, which took her from her home, she nevertheless was extremely apprehensive as to the outcome of her physical condition. In speaking of it she said "I was feeling bad and getting older, and I said, 'Sometimes I feel good and sometimes bad, and by me going away I might drop on the street.'" It was at this time that her daughter approached her, as she had done a number of times before, and asked her to convey the property to her, saying

"Any time you want it you can have it back." In response
to the daughter's request, accompanied by her promise to re-
convey the property to her when she wished her to do so,
a deed was drawn and executed by the mother while sick,
conveying the property to her daughter. Thereafter she
called upon her daughter to reconvey the property to her,
but the latter refused to reconvey it to her, saying "She was
going to let it stay as it is."

Mrs. Dillfelder, the daughter, testified that her mother
gave and conveyed to her the property, as she had promised,
without receiving from her any promise to reconvey it to
her. She testified, however, that she did tell her mother that
she could have a home there as long as she lived. She also
testified that on one occasion, not long after her marriage,
her mother said to her "You can sell the house and put me
out." She was asked what reply she made to this statement,
and she said, "I was living at my mother-in-law's at the
time, I said, 'How do you get that way, what is the matter
with you?'" and then when asked what she then said, she
replied, "My mother-in-law quieted her down and we sat
there and talked it over. I said I never had anything like
that in my head." The witness further testified that she
regarded the house as her own, though she admitted that
she, though married and living in the house with her hus-
band, never paid or offered to pay any part of the mortgage
debt then resting as a lien upon the property, and never
thereafter paid the taxes, ground or water rents thereon;
that on one or more occasions she went to the city hall to
pay the taxes or water rent, but found them paid; that she
would have paid them, but was anticipated by her mother,
although, when called upon by her mother to pay for the
release of the mortgage amounting to five dollars, after it
had been paid off by Mrs. Winterling, she refused to pay it
and it was paid by her mother. She was asked if she ever
offered her mother money with which to pay the taxes, rents
and other bills against the property and she replied, "No,

sir; I wanted to pay them myself and have my name at the bottom of the bill, so I would know I paid them. Q. How do you know your name was not on the bill? A. Because I knew my mother was not so kind hearted to put my name on the bill. She was all for herself. Q. She conveyed this property to you, didn't she? A. She would never had done it unless she had to." She was then asked by the court, "Why do you say that, why did she have to?" She replied "She always promised to give it to me. She put it in my name."

Frank Dillfelder, the husband of the appellant, when placed upon the stand by his wife, testified that he was a visitor at Mrs. Winterling's home for about three years before his marriage to her daughter. He said he had frequently heard Mrs. Winterling say during that period that she intended to put the house in the daughter's name and heard her tell her daughter, on the day the deed was executed, that she had put it in her name. The daughter replied thereto, saying: "She (the mother) would always have a home as long as she lived, so long as she done what was. right and acted respectable." He had often heard Mrs. Winterling say to her daughter she would like to have the house back. His wife at such times would reply by saying "She should be satisfied so long as she has got a home." He never heard his wife say she would deed it back to her, and he knew she was not going to convey it to her.

The repairs to the property made by the appellant mentioned in the answer consisted only of work that Dillfelder himself did on the house and garage, and the furnishing of certain materials which he said would probably amount to fifty dollars.

It is contended by the appellee that, upon the facts and circumstances stated, the conveyance of the property to the daughter by the mother, with the daughter's promise to reconvey it to her when asked to do so, raised a constructive trust in favor of the mother, to the extent that the daughter was to hold the title of the property for her mother until

asked to reconvey it to her. And that upon her failure and refusal to convey it when so asked, she became a trustee *ex maleficio,* and, as a result thereof, the mother is entitled either to have the deed cancelled and set aside or the property reconveyed to her.

It is said in 26 *R. C. L.* 1238, "Whenever a person acquires the legal title to land or other property by voluntary conveyance by means of an intentionally false and fraudulent verbal promise to hold the same for a certain specific purpose, * * * as, for example, a promise to convey the land to a designated individual, to reconvey it to the grantor, or the like, * * * and, having thus fraudulently obtained the title, he retains, uses and claims the property as absolutely his own, the whole transaction by means of which the ownership is obtained will be treated, in equity, as a scheme of actual deceit, and the court will treat the person so acquiring the legal title as a trustee, and decree him to hold the title for the benefit of the true beneficiary. The Statute of Frauds, which was intended to prevent frauds, turns against him as the perpetrator of a fraud. It is not, therefore, the fact that the bargain by which he obtained the title is verbal that governs a case, but the fact that he procured the title to be made to him in confidence, the breach of which is fraudulent and in bad faith. The ground of equitable relief and immunity from the statute is the fraud perpetrated, not the agreement to hold in trust. Such a trust does not affect the deed, but acts upon the gift as it reaches the possession of the grantee, and the foundation for the trust is that equity will then interfere and raise a trust in favor of the person intended to be benefited, in order to prevent a fraud. * * * What constitutes fraud in the case of a promise to hold in trust or reconvey on receiving a voluntary conveyance sufficient to take the case out of the operation of the Statute of Frauds, depends in a large measure on the relation to each other of the parties to the transaction. Fraud is much more readily inferred where the parties occupy a confidential or fiduciary relation toward each other, and it seems to be well

settled that where a conveyance is made between parties standing in such relation to each other, on a parol agreement of the grantee to hold the land in trust for or convey it to some one else, when in fact the grantee has no intention of performing the agreement, but intends to retain the benefit of the conveyance for his own use, the law raises a constructive trust, and takes the case out of the operation of the Statute of Frauds." *Larmon v. Knight,* 140 Ill. 232; *Stahl v. Stahl,* 214 Ill. 131, 2 A. & E. Ann. Cases, 774; *Ahrens v. Jones,* 169 N. Y. 555; *Broder v. Conklin,* 77 Cal. 330; *Nordholt v. Nordholt,* 87 Cal. 552; *Crossman v. Keister,* 223 Ill. 69; *Hatcher v. Hatcher,* 264 Pa. 105; *Shortridge v. Shortridge,* 207 Ky. 790; *Springer v. Springer,* 144 Md. 465; *Jasinski v. Stankowski,* 145 Md. 58.

In a note to *Stahl v. Stahl,* in 2 A. & E. Ann. Cases, it is said: "Where a person, occupying a confidential relation to the owner of real property, takes advantage of the confidence reposed in him by virtue of such relation and acquires an absolute conveyance of the property without consideration, through a verbal agreement whereby he undertakes to hold the property in trust for some legitimate purpose or to reconvey it to the grantor, his refusal to carry out the trust, or to reconvey the property, is such an abuse of confidence as will justify a court of equity in fixing a constructive trust on the property, upon parol evidence showing the terms of the agreement, as the Statute of Frauds does not apply to such a case. In support of this statement, the following cases are cited: *Broder v. Conklin, supra; Nordholt v. Nordholt, supra; Bohm v. Bohm,* 9 Colo. 100; *Allen v. Jackson,* 122 Ill. 567; *Gruhn v. Richardson,* 128 Ill. 178; *Koefoed v. Thompson,* 73 Neb. 128; and other cases.

In *Hatcher v. Hatcher, supra,* Mary M. Hatcher executed a deed to her son, Charles, conveying to him certain real estate in the city of Philadelphia. Thereafter Charles was called upon to reconvey the property to the plaintiffs, devisees under the will of Mary M. Hatcher, who had died since the execution of the deed, and upon his refusal to do

so, a bill was filed asking that he be ordered to reconvey the
property to them upon the ground that he had orally agreed
and promised at the time of the execution of the deed to re-
convey the property to the grantor, his mother, upon demand
being made of him, but when asked, refused to do so. He,
in his answer, denied making such promise to his mother,
but, after hearing on bill, answer and evidence taken, the
court below declared that Charles held the title to the prop-
erty in trust for the plaintiffs and ordered and directed him,
within the time therein named, to reconvey the property to
the plaintiffs in fee simple by a good and sufficient deed.
The facts, as found by the court below, were, as stated above,
that the mother had conveyed the property to her son, Charles,
under the agreement and promise that he would reconvey it
to her at any time that she made demand therefor and, by
such agreement and promise, she was induced to make the
conveyance, which she otherwise would not have done.    It
was also found, as in this case, that the deed was without
consideration and, as we understand from the report of that
case, no change of possession of the real estate was ever made.
Chief Justice Brown, speaking for the court, in affirming
the decree of the lower court, said: "The title procured by
the appellant from his mother undoubtedly passed to him by
reason of her confidence in him, and, upon his abuse of that
confidence, in refusing to reconvey the property * * *, he
converted himself into a trustee *ex maleficio.*"

In *Springer v. Springer,* 144 Md. 465, Rev. Thomas L.
Springer purchased a house and lot in the city of Baltimore
for a home for himself and family.    At the time he was
suffering with a cataract upon one of his eyes, which was to
be removed by an operation then to be made, and in this
condition, not knowing what might be the result of the oper-
ation, he thought it best to put the title to the property so
bought in his son, James, then seventeen years of age, and
living with him, which he did, as he says "with the expecta-
tion and understanding of the family that in case of the

operation coming out successfully the deed would be put in my name." This Court, speaking through Judge Offutt, said: "There is a class of trusts which arise *ex maleficio,* and equity in order to reach the possessor of what in conscience belongs to another turns him into a trustee. The fraud referred to in these definitions need not be actual, but may be constructive, and one "who acquires land or other property by fraud, misrepresentation, imposition, concealment, or under any other such circumstances as render it inequitable for him to retain it, is in equity regarded as the trustee of the party who suffers by reason of the fraud or other wrong and who is equitably entitled to the property." And a violation of a parol agreement to hold property in trust for another may, under certain circumstances, be sufficient evidence of fraud to raise a trust in favor of the promisee (39 *Cyc.* 178), and such an agreement may be inferred from the acts and conduct of the parties, as well as from their spoken words. *Mead v. Robertson,* 131 Mo. App. 185; *Crossman v. Keister,* 223 Ill. 69, 8 L. R. A. (N. S.), 707. As where a grantee, knowing from the statements and conduct of the grantor that the grant is upon trusts which the grantor believes he will carry out, accepts the grant under circumstances which to his knowledge justify such a belief. *Ibid.* 4 Ves. 10; *Suman v. Harvey,* 114 Md. 255, 256; *Ruhe v. Ruhe,* 113 Md. 601; *Clark v. Clark,* 139 Md. 42." Judge Offutt then, after stating and discussing the facts of the case, concludes by saying: "When therefore the land was conveyed to him, James knew that his father understood and believed that he held it in trust and that he would surrender it whenever requested to do so by his father and mother, and that but for that belief the property would not have been conveyed to him and with that knowledge he accepted the grant. And with that knowledge he suffered his father to act as the undisputed owner of the property for some seventeen years. He stood by and permitted his father to spend money not only to pay the taxes, ground rent, water rent, interest and

part of the principal of the loans made for the purchase
money, but also for repairs and improvements on the prop-
erty, amounting in one year to as much as $1,200, without
ever indicating that he claimed the property as his own.
* * * Having secured the title to the property upon the
understanding that he would hold it in trust for his father
and mother, and having for so many years permitted them
to act as the real owners of it, and to expend considerable
sums of money upon it in the belief that they were the real
owners of it, he cannot now repudiate his trust and treat
the property as his own."

In the more recent date of *Jasinski v. Stankowski*, 145 Md.
p. 58, certain real estate in Baltimore City was conveyed by
Joseph Jasinski and wife to their daughter, Kazimiera Stan-
kowski and her husband. The conveyance was made in
anticipation of the death of Mrs. Jasinski, who was then in
her last illness, for the purpose of safeguarding the interests
of her children in the event of her husband's remarriage. The
deed was said by the plaintiffs to have been executed and
delivered with the understanding that the children of the
grantors should have an equal interest in the property. After
its execution, Mrs. Jasinski died and her husband remarried.
Thereafter, Kasimiera Stankowski and her husband con-
veyed the property to her father's second wife, Walentyna
Jasinski. Thereafter Jasinski died and his widow, the
grantee, repudiated the alleged trust and, because of the
repudiation of such trust by the grantee, a bill was there-
after filed by the children of Jasinski by his first wife,
asking to have the conveyance from Kazimiera Stankowski
and husband to his wife cancelled and annulled, on the
ground that the grantors thereof were fraudulently induced
to make the conveyance to the step-mother, upon her promise
to hold the property in trust for the benefit of the children
of her husband by his first wife. This allegation of the bill
was denied by the answer of the defendant, but the trial
of the case resulted in a decree, "declaring the existence, and

enforcing the terms, of the trust described in the bill of complaint." This Court said, speaking through Judge Urner, "Among the cases in which trusts are held to arise by construction of law are those where the conveyance of property is fraudulently procured by the grantee upon the faith of a parol trust agreement which is subsequently repudiated. Upon the just principle that the perpetrator of such a fraud will not be permitted to profit by his own wrong, the law creates a trust by implication for the protection of the rights which would otherwise be defeated. The principle is thus stated in 26 *R. C. L.* 1233, as follows: 'While the Statute of Frauds requires a writing to create an express trust in real property, it has no application to cases where the law raises a constructive trust by reason of the fraudulent acts and purposes in procuring title to the land. The rule in equity has always been that the statute is not allowed to operate as a protection for a fraud, or as a means of seducing the unwary into a false confidence, whereby their intentions are betrayed, and parol trusts in real estate have been frequently established in direct contradiction of the statute on the ground of fraud. Constructive trusts are held not within the statute because they rest in the end on the doctrine of estoppel, and the operation of an estoppel is never affected by the Statute of Frauds.' "

In that case it was contended that there was no evidence of fraudulent intent or purpose in the procurement of the deed. The Court, however, said, "The wrong has been committed under a conveyance which the defendant herself appears to have proposed." It is true that the defendant denied such fact, but the court in speaking of such denial said, "The active part which the defendant is thus shown to have had in the transfer to her of the property which she seeks to retain, contrary to the agreement, is a circumstance to be considered upon the question as to the inception of the wrongful purpose.

This Court in that case held there was sufficient ground

in the proof upon which to declare the existence of a constructive trust in favor of the plaintiff as to the property in litigation, and affirmed the conclusion of the lower court, embraced in its decree, which required an eventual conveyance of the property to the plaintiff in pursuance of the trust so declared.

In this case the plaintiff swore positively that the conveyance was made to her daughter upon the many requests of the latter, and with the understanding and promise of the daughter that she would reconvey the property to her when asked to do so, and that it was because of such promise and agreement that she was induced to make the conveyance, though the daughter testified that she did not request her to make the conveyance and did not promise to reconvey the property to her.

It is undisputed, however, that the property was obtained by the mother largely through her own labor in scrubbing floors and doing other work of like character. Mrs. Winterling, who could neither read nor write, spent many years of labor in the acquisition of the property. It was conveyed without consideration, at a time when she was ill, to one whom she said she loved and still loves and to one that she wished to have the property at her death, but it is clear, we think, both from her evidence and conduct, that she did not wish to dispose of her property unconditionally while living. She conveyed it, as she says, because she wished her daughter to have it at her death, and being in ill health and not knowing how suddenly death might come, the conveyance was made so that the daughter would have it in the event of an unexpected death, but it was never, we think, her intention to place the title of the property in her daughter so that she could not recall it at any time if she so wished. And the promise of the daughter to reconvey it to her was altogether consistent therewith. Her determined persistency in holding on to the deed and not surrendering possession of the property to the daughter, and the payment

by her of the balance of the mortgage debt, as well as the
ground and water rents and other bills upon the house, all
indicate that she regarded the property as hers, and the acts
of the daughter in permitting her to pay off the mortgage
and other charges mentioned likewise indicate that she, the
daughter, did not regard the deed as conveying to her an
unqualified, unconditional title to the property, or if so,
she knowingly and wrongfully permitted her mother to act
upon the assumption that the property was hers and allowed
her to expend sums of money thereon when the benefits there-
of would accrue only to her, the grantee.

In the trial below the able and conscientious chancellor
saw and heard the witnesses testify and was enabled from
the presence and demeanor of the witnesses to better deter-
mine the effect and weight of their testimony, and it is
evident from the decree passed by him that he, in cancelling
and setting aside the deed, did not accept as correct, at least,
the evidence of the witnesses of the appellant, but adopted
the evidence of the appellee.

As was said by Judge Urner in *Jasinski v. Stankowski,*
quoting from note, 39 *L. R. A.* (N. S.), 911, "to avoid the
injustice arising from the repudiation of a parol trust, courts
of equity have frequently seized upon the slightest circum-
stances connected with the procurement of the conveyance
to avoid the operation of the Statute of Frauds and perhaps
the most satisfactory inference of a fraudulent interest on
the part of the grantee is to be derived from his activity in
procuring the conveyance."

The daughter's activity in the procurement of the con-
veyance, is, we think, sufficiently shown from all the evidence
in this case, and it would be inequitable to permit the daugh-
ter to take advantage of her own wrong in retaining title to
the property.

Upon the acceptance of the grant by the grantee, with the
promise and agreement stated, the law raised a constructive
trust and took the case out of the operation of the Statute

of Frauds. By such trust the daughter was to hold for her mother the title in the property until asked by the grantor to reconvey it to her, when she was to reconvey it to her, and upon the grantee's repudiation of such trust by her refusal to convey the property to her mother when so called upon to do so, she became a trustee *ex maleficio* and she should have been ordered to reconvey the property to her mother. And therefore as the decree appealed from did not so order, but set aside and cancelled said deed, we will reverse said decree, and remand the case to the end that a decree may be passed in conformity with the views here expressed.

> *Decree reversed and case remanded that a decree may be passed in conformity with this opinion, with costs to the appellant.*