EISINGER MILL & LUMBER COMPANY ET AL. *v.*
CHARLES E. DILLON ET AL.
[No. 11, April Term, 1930.]

*Decided May 16th, 1930.*

The cause was argued before BOND, C. J., PATTISON, URNER, ADKINS, OFFUTT, DIGGES, PARKE, and SLOAN, JJ.

*Charles W. Clagett,* with whom was *Harold C. Smith,* on the brief, for the appellants.

*Albert M. Bouic,* for the appellees.

PATTISON, J., delivered the opinion of the Court.

Charles E. Dillon, one of the appellees, bought of Anne Evans and Morris Evans, her husband, also appellees, lots numbered 12, 13, and 14, of Block No. 7, in Smith & Jordan's Addition to Silver Spring, Maryland. On the 19th day of April, 1927, these lots were conveyed to Dillon, and on the same day Dillon and wife executed two deeds of trust on each of said lots, to secure notes payable to one M. J. Keane. These deeds of trust were recorded on the next day, April 20th. Three of them, one on each of said lots, were recorded a few minutes after the others. The notes secured by the first recorded deeds of trust, herein called the first deeds of trust, were endorsed by M. J. Keane to the appellee, the Title and Investment Company of Maryland, hereinafter called the Title Company. These first deeds of trust were to secure building loans, of $8,250 on Lot No. 12, and $7,250 on each of Lots Nos. 13 and 14. The money was to be paid, though not so stated in the deeds of trust, "one-seventh when the first floor joists were in; one-seventh when the second floor joists were in; one-seventh when the roof was on; one-seventh when plastered; one-seventh when trimmed out, and the balance, less costs, when the buildings were completed and release of liens filed."

The notes secured by the deeds of trust last recorded, herein called the second deeds of trust, were endorsed in blank and delivered to Morris Evans, who, with his wife, had conveyed the lots to Dillon, the amounts thereof being $4,500 on Lot No. 12, and $2,700 on each of Lots Nos. 13 and 14, the same being the purchase money for said lots; and, by the agreements of parties, these deeds were made second to the first deeds of trust.

After the execution of the aforegoing deeds of trust, Dillon gave the Title Company three bonds, with the New York In-

demnity Company as surety, conditioned for the erection of the respective buildings, within the time therein stated, free from the claims of all persons supplying labor and materials, and to save harmless the Title Company from any loss it might sustain by reason of the non-completion of the buildings within the time stated or from unpaid mechanics' liens.

At the time of the purchase and conveyance of said lots, and the execution of said deeds of trust, there was a blanket deed of trust upon these lots, held by the Title Company, for the sum of $2,797, which was first executed to secure a note to one Eugene A. Smith, but by various assignments had become the property of the Title Company.

On June 9th, 1927, E. W. Cissel, assistant secretary-treasurer of the Title Company, wrote to Charles E. Dillon the following letter:

"Dear Sir:

"This company has approved the following construction loans to you:

"$7,250.00 on Lot No. 13, block 7; $7,250.00 on Lot No. 14, block 7; $8,250.00 on Lot No. 12, block 7, Smith & Jordan's Addition to Silver Spring. The money to be advanced as follows: One-seventh when first floor joists are on; one-seventh when second floor joists are on; one-seventh when roof is on; one-seventh when plastered; one-seventh when trimmed out and balanced less costs, when building is completed and release of liens filed with us."

The appellants, the Eisinger Mill & Lumber Company, and Harwood & Langley, filed in the office of the clerk of the Circuit Court for Montgomery County mechanics' liens for materials furnished and for work and labor done in the erection of the houses on said lots of land.

Before the buildings were completed, Dillon, in the fall of 1927, stopped all work upon them; and Lot No. 12, with improvements thereon, was sold under foreclosure proceedings, instituted upon the second deed of trust. One Brockway became the purchaser of it at the sale so made, and to

him the property was conveyed on the 21st day of February, 1928. Thereafter, on the 20th day of March following, the first deed of trust on Lot No. 12, for $8,250 was released. To procure the release, Brockway caused to be paid to the Title Company $3,724.50, and thereafter the erection of the house was completed by him.

Lots Nos. 13 and 14 were afterwards sold under foreclosure proceedings, instituted upon the first deeds of trust, both of which were purchased by the Title Company, each for the sum of $3,500, and on the 20th day of March the lots were conveyed to the purchaser. On the same day they were first conveyed to Leah Corbon by the Title Company, and by her conveyed to Frank H. Wurzbacher, by whom the houses were completed.

On the 28th day of October, 1927, the appellants, the Eisinger Mill & Lumber Company and Harwood & Langley, filed their first bill of complaint against the said appellees and others, but on June 13th, 1929, upon their petition, they were allowed to file an amended bill, which was filed on June 21, 1929. In addition to the above conceded facts, the following facts were alleged in the bill:

That the letter of June 9th, 1927, from E. W. Cissel, assistant secretary-treasurer of the Title Company, to Charles E. Dillon was procured at the instance of Dillon, that he might show it to the appellants and others and thereby induce them to furnish work and materials in the erection of said buildings, which, without said letter, he had been unable to obtain. This letter, as alleged, "was issued in pursuance of a general usage and custom existing for a long time prior hereto and generally followed and recognized among lenders and borrowers upon real estate and those dealing and contracting with them in the erection of buildings in Maryland and the District of Columbia, which custom and usage was well known to the defendant, the Title Company, and which letters are used by the borrower in securing credit in his construction of the buildings loaned upon and relied upon by those dealing with the borrower." That after obtaining the letter of June 9th, 1927, Dillon exhibited it to those

from whom he sought to obtain work and materials, and when exhibited to the lumber company, Dillon was told by it that before it would agree to furnish materials for the erection of the houses he should "write a letter to the Title Company, on behalf of itself and all persons and corporations who might furnish materials or do work as sub-contractors upon said buildings," notifying said Title Company that he had appointed the Chevy Chase Savings Bank of Chevy Chase, Maryland, to disburse the money loaned by said company to him for the construction of said buildings. That on June 24th, 1927, Dillon wrote the Title Company as follows:

"Gentlemen:

"I have this day arranged with the Chevy Chase Savings Bank to disburse the funds paid to me on the three loans on Lots 13, 14 and 12, block 7, 'Smith and Jordan's Addition to Silver Spring,' and would like to have you deliver checks for all payments on these three loans to the above-mentioned bank.

"Of course, this will not change the status of this loan in any way and the checks are still to be made payable to me.

"Trusting this will meet with your approval,"

As alleged, this letter was delivered, on the day it was written, to the Title Company, and the appellants, relying upon it and the letter to Dillon of June 9th, and upon the general custom, as stated, agreed and contracted to furnish Dillon material and work in the erection of the buildings, upon the assumption, as alleged by them, that these letters and the custom mentioned "created a constructive trust in the proceeds of said first deeds of trust for the payment of their claims for material and work furnished and supplied by them to the said Dillon in the erection of the said houses."

Among the prayers of the bill are:

First, That a decree be passed, establishing the mechanics' liens of the plaintiffs against said properties with priority of lien over the first and second deeds of trust, and directing the enforcement of said liens.

Second, That a decree be passed declaring "that the Title and Investment Company of Maryland held the proceeds of said first deeds of trust upon the said real estate in trust" for the plaintiffs "and all other materialmen and sub-contractors similarly situated, and the defendant, Charles E. Dillon"; or that said company held the proceeds of said deeds of trust "in trust to make all payments by check as constructtion installments became due and to forward the said checks to the Chevy Chase Savings Bank for distribution of the proceeds thereof among the persons and corporations equitably entitled thereto."

Third, That a decree be passed declaring the first deeds of trust void as against the plaintiffs.

Additional relief was asked by other prayers of the bill, but as the granting of such relief was dependent upon the affirmative action of the court in granting the relief asked for in the second prayer herein stated, they will not be inserted.

We will first consider the prayer asking that the first deeds of trust be declared void. This prayer was not, as we recall, discussed in the oral argument and no mention of it is made in the appellants' brief, and we are not informed as to the grounds upon which we are asked to hold the deeds of trust void, unless it be upon the ground, discussed by the appellee in its brief, that the future payments were not mentioned in them. This was unnecessary, as shown by the latter clause of section 2 of article 66 of the Code. *Wilson v. Russell,* 13 Md. 530.

And upon the evidence found in the record, we must decide adversely to the claim or contention of the appellants that their mechanics' liens had priority of lien over the first and second deeds of trust, as it is clearly shown that these deeds of trust were executed and recorded prior to the time when the work was done and the materials furnished by the appellants. Code, art. 63, sec. 15.

This leaves for our consideration the sole question whether the Title Company held the proceeds of said first deeds of trust in trust for the plaintiffs and others furnishing work and materials in the erection of said houses.

It is contended by the appellants, that the trust in their favor, claimed by them to exist in this case, is what is called a constructive trust, arising from the acts of the appellee, the title company.

A constructive trust may be defined as one, not arising by agreement or intention, but by operation of law, and in which fraud is an essential element, though actual fraud is not necessary, as such a trust will arise where property is acquired under circumstances that will make it inequitable for him who holds the legal title to retain it. 39 *Cyc.* 169. Or, as this court said in the recent case of *Springer v. Springer,* 144 Md. 465: "Constructive trusts are such as are raised by equity in respect of property which has been acquired by fraud, or where, though acquired originally without fraud, it is against equity that it should be retained by him who holds it. They arise purely by construction of equity, independently of any actual or presumed intention of the parties to create a trust, and are generally thrust on the trustees for the purpose of working out the remedy. The trusts are not what are known as technical trusts, and the ground of relief in such cases is, strictly speaking, fraud, and not trust. Equity declares the trust in order that it may lay its hand on the thing and wrest it from the possession of the wrong-doer."

It is with this definition of a constructive trust before us that we are to determine whether upon the facts of this case a constructive trust was created in the proceeds of the deeds of trust, in favor of the appellants, as claimed by them.

The loans were made with the view of enabling Dillon to build the houses upon the lots mentioned and, by an agreement between him and the Title Company, the amounts borrowed were to be advanced to Dillon as the buildings progressed. This method of payment was adopted so that at no time the amounts advanced upon the loans would be in excess of the increased value of the properties caused by the improvements being placed thereon in the erection of the houses. It was, therefore, for the protection of the lender alone that the money was so paid in installments. Of course,

those persons sought by Dillon to furnish him work or materials in the erection of the houses would naturally be interested in knowing whether Dillon had the necessary money or means with which to build the houses and to pay them for work and material furnished in building them, and the appellants may have been, and no doubt were, influenced in extending credit to Dillon because of the knowledge they had of the loan he had obtained from the Title Company, but as there was no obligation upon that company to see that the money paid Dillon was applied to the payment of the claims of the appellants, the latter had to rely upon Dillon for the payment of their claims. The only obligation of the Title Company was the one to Dillon to pay him the amounts named in the agreement when they became due.

It is, however, claimed by the appellants that the effect of the letter of June 9th, which was known to them, when considered in connection with the letter of June 24th, from Dillon to the Title Company, and the alleged custom of trade, above alluded to, was to create a constructive trust in their favor as to the proceeds of the first deeds of trust. In the letter of June 24th, Dillon told the Title Company that he had "arranged with the Chevy Chase Savings Bank to disburse the funds" that were to be paid to him "on the three loans" and that he "would like to have" the Title Company "deliver checks for all payments on these three loans to the above mentioned bank." This letter, Eisinger, of the Eisinger Mill & Lumber Company, said was delivered by him to a clerk of the Title Company, with the request that he give it to Mr. Cissel upon his return to the office; while Dillon testified that he delivered the letter to Cissel. Mr. Cissel testified that, in his absence, some one brought the letter of June 24th to his office, the young man who received it "did not know who brought it, but several days after that * * * Dillon came in and asked about the letter and he said he had made other arrangements and, as I recall, he took the letter out, and evidently he must have, because I have caused a search through the files and the letter is not there. I never thought anything more about the letter, because I thought it

was another scheme of his that failed," as he had once before come to the office and made a like proposition in relation to the District National Bank, but afterwards Dillon told him that the District National Bank had refused to do it, "that it would not be bothered with it." Thereafter the Title Company "gave the money to him from time to time," as it became due, and he "never heard a word from Mr. Eisinger that they were relying upon that letter. Mr. Eisinger was in the office one day and I believe Mr. Langley was with him and asked us to accept an assignment and I told him we could not do that," as "the Title Company had had trouble with previous assignments of that character and it "had passed a resolution that they would not receive any more assignments on construction loans."

Dillon denied that he told Cissel that he had made other arrangements, and that he had taken the letter from the office of the Title Company. But the evidence of Dillon is entitled to little, if any, weight, as he thereafter refused to disclose what he had done with the money paid to him by the Title Company upon the construction loan, on the ground that it might incriminate him to answer.

It is further disclosed by the record that Eisinger, prior to the letter of June 24th, called upon Cissel and asked if the Title Company would pay to them direct the amount of their contract for materials furnished by them to Dillon, and the Title Company refused to do it. Eisinger knew of this letter of June 24th, which he says he delivered to the Title Company, and Langley was told of it by Dillon, but neither of them knew the action, if any, that was taken thereon by the Title Company, nor did either of them inquire whether the terms and conditions therein were ever accepted by the Title Company.

There is no evidence showing that the terms and conditions of the letter of June 24th were accepted by the Title Company. The only reliable evidence upon this question is that of Cissel, who testified that the terms and conditions of the letter were never accepted by the Title Company, and that

the letter was taken from the office by Dillon, he, at the time, saying that he had made other arrangements.

Upon these facts we are unable to find fraud, actual or constructive, essential to the creation of a constructive trust. There are other alleged reasons presented by the appellants upon which they claim the relief sought should be granted, but these, we think, are altogether insufficient to entitle them to the relief sought, and we will, therefore, affirm the decree appealed from dismissing the bill.

*Decree affirmed, with costs.*