FREDERICK B. HARTSOCK *v.* VALDA BERZINS STRONG, PERSONAL REPRESENTATIVE OF THE ESTATE OF WILLIAM RONALD STRONG

[No. 683, September Term, 1973.]

*Decided April 24, 1974.*

The cause was argued before GILBERT, MENCHINE and DAVIDSON, JJ.

*Benjamin D. Levine,* with whom were *Hubert M. Schlosberg* and *Dexter M. Kohn* on the brief, for appellant.

*George C. Pendleton,* with whom was *Jackson Brodsky* on the brief, for appellee.

GILBERT, J., delivered the opinion of the Court.

This appeal, from a decree of the Circuit Court for Montgomery County (Shearin, J.), arises from the medical partnership of the appellant, Dr. Frederick B. Hartsock, and the now deceased, Dr. William Ronald Strong. The essence of this case is whether the chancellor erred in impressing a constructive trust in favor of Valda Berzins Strong, the widow and personal representative of Dr. Strong's estate, upon the proceeds of two insurance policies issued upon Dr. Strong's life, but owned by Dr. Hartsock.

The record discloses that Drs. Hartsock and Strong entered into a written partnership agreement on December 29, 1959. By the terms of the agreement the doctors covenanted that they would remain partners in a medical compensation clinic for a term of ten years, self-renewing for succeeding five year periods unless the termination clause embodied in the agreement was exercised by either partner. The partnership traded under the name "Faragut Medical Clinic". Although the business was conducted in the District of Columbia, both the decedent and the appellant resided in Montgomery County, Maryland.

Section 24 of the partnership agreement provided that upon the death of either partner the survivor would continue the partnership business without interruption and would *inter alia,* in the manner provided in the agreement, purchase the interest of the deceased partner from his estate. Among the items to be purchased by the survivor was "good will", and a dollar amount was assigned to that factor. The surviving partner was to pay to his deceased partner's estate:

> "The sum of $7,500 which the parties hereto agree represents their share of the good will of the clinic. This amount may be changed by subsequent amendments to this agreement, but if there is no amendment, this amount will apply."

The partnership was conducted on a fifty-fifty basis. The

parties further agreed that in order to have sufficient monies available, or at least a substantial portion of the money, to purchase a deceased partner's share, that each would obtain a life insurance policy on the other partner in the amount of twenty thousand dollars ($20,000). The policy was to name the insured's partner as beneficiary, and the insured possessed none of the incidents of ownership. On February 6, 1960 the Lincoln National Life Insurance Company issued its policy in the amount of twenty thousand dollars ($20,000) on the life of Dr. Strong. Dr. Hartsock was named as the owner and beneficiary.

The partnership prospered to the point that Eugene F. Roesser, an insurance agent and a member of the District of Columbia Bar, wrote under date of January 22, 1962 to Drs. Hartsock and Strong that:

> "It is my opinion that based on your current [financial] statement, the good will value at the death of either of you should be $40,000 . . . . Sheldon Noble [a certified public accountant for the doctors] agrees.
>
> You currently own $20,000 of insurance on each other, of which $7,500 represents payment for good will and the difference is to help the survivor pay for the 1/2 interest in . . . non liquid assets which he must buy from the estate. I recommend that you increase the insurance by $30,000 each, making the total amount you will own on each other an even $50,000. $40,000 of this may then be used for the good will purchase and the balance of $10,000 used to pay for other partnership assets."

The doctors were informed that if they agreed, they were to sign the forms that had been enclosed with the letter, return the forms and forward a partnership check covering the premium. The doctors were of the same age so that the premium charged each was identical. The letter further advised that arrangements would be made for the necessary medical examinations.

A $30,000 insurance policy on the life of William Ronald Strong was issued by the New England Mutual Life

Insurance Company on February 6, 1962 with Dr. Hartsock named as beneficiary and owner. The partnership continued until Dr. Strong's demise in May of 1972. Mrs. Strong, the personal representative of Dr. Strong's estate, made demand upon the appellant for the payment of $40,000 good will and half of the other assets of the partnership. According to testimony presented by accountants the sum due Dr. Strong's estate, exclusive of good will, was $17,260. The testimony further revealed that Dr. Hartsock received $50,475.13 from the two insurance companies that had written policies on Dr. Strong's life. When the monies demanded from the appellant were not received, the personal representative filed a Bill of Complaint in the Circuit Court for Montgomery County in which she alleged the partnership agreement, covenant to repurchase, existence of the two life insurance policies, receipt of the proceeds therefrom by Dr. Hartsock and the doctor's failure to abide by the terms of the partnership agreement. The appellant demurred to the Bill of Complaint basically on the ground that it failed to allege that there had been an amendment to the partnership agreement by which the good will was increased from $7,500 each to $40,000 each.[1] The demurrer was overruled, and after an answer was filed, the case proceeded to trial. Roesser testified concerning the letter of January 22, 1962 in which he had recommended the increase in life insurance as well as the increase in partnership good will. Roesser said that Dr. Hartsock's attorney, Richard Hartsock, who was also the doctor's brother, had called Roesser on April 26, 1962 in reference to amending the partnership agreement. A draft of the amendment had been prepared by Roesser. Roesser further said that Richard Hartsock felt that the good will value was on the low side and should be raised to "around $65,000." There was also a discussion pertaining to the disability provisions of the partnership agreement, and it was decided that the attorneys would defer final decision until the doctors and the attorneys had an opportunity to arrive at a

---

1. The appellant filed an "Offer of Judgment" on July 6, 1973, twelve days before trial commenced. The offer was for $20,876.00.

decision acceptable to all concerned. Roesser, as was his habit, dictated a memorandum of his conversation with Richard Hartsock. While the testimony of Roesser concerning his conversation with Richard Hartsock came in over objection, there was no objection to the admission into evidence of the memorandum itself. Richard Hartsock, testifying for the appellant, said that he had no recollection of any such discussion with Roesser.

The Chancellor found:

(1) that the letter dated January 22, 1962, from Roesser to the deceased, was in fact written;

(2) that the appellant and the deceased acted in accordance with the recommendations contained in the letter;

(3) that the conversation between Roesser and Richard Hartsock had in fact occurred, and that Richard Hartsock, who had kept no memorandum, could hardly be expected to remember a telephone conversation occurring eleven years before;

(4) that the partners, by their action, did amend the partnership agreement so as to increase good will from $7,500 each to $40,000 each;

(5) that the $50,000 of insurance could be used to purchase, upon the death of either partner, the $40,000 "good will" and the $10,000 balance could be applied to the purchase of the deceased partner's one-half interest in the remaining partnership assets.

(6) that the amount due and owing, exclusive of good will, by the appellant to Dr. Strong's estate was $17,260;

(7) that the appellant had received $50,475.13 in life insurance proceeds;

(8) that the total amount due Dr. Strong's estate by the appellant was $57,260.

The court then imposed a constructive trust upon the proceeds of the two insurance policies in question and signed

a decree on August 19, 1973 in which it ordered payment by the appellant to his deceased partner's estate in the amount of $57,260 with interest.

## I.

"Constructive trusts are such as are raised by equity in respect of property which has been acquired by fraud, or where, though acquired originally without fraud, it is against equity that it should be retained by him who holds it. They arise purely by construction of equity, independently of any actual or presumed intention of the parties to create a trust, and are generally thrust on the trustees for the purpose of working out the remedy. The trusts are not what are known as technical trusts, and the ground of relief in such cases is, strictly speaking, fraud, and not trust. Equity declares the trust in order that it may lay its hand on the thing and wrest it from the possession of the wrongdoer. Constructive trusts may be divided into three classes: first, trusts that arise from actual fraud; second, trusts that arise from constructive fraud; third, trusts that arise from some equitable principle independent of the existence of any fraud." (Footnotes omitted). 26 R.C.L. *Trusts* § 78 (1920).

*See also Springer v. Springer*, 144 Md. 465, 479, 125 A. 162, 168 (1924).

Judge Cardozo (later Mr. Justice Cardozo) in *Beatty v. Guggenheim Exploration Co.*, 225 N. Y. 380, 386, 122 N. E. 378, 380 (1919), put it thusly:

"A constructive trust is the formula through which the conscience of equity finds expression. When property has been acquired in such circumstances that the holder of the legal title may not in good conscience retain the beneficial interest, equity converts him into a trustee. . . ."

3 Scott, *The Law of Trusts* § 462 (1939) states:

"A constructive trust arises where a person who

holds title to property is subject to an equitable duty to convey it to another on the ground that he would be unjustly enriched if he were permitted to retain it. When a person holds the title to property which he is under an obligation to convey to another, and when that obligation does not arise merely because he has voluntarily assumed it, he is said to hold the property in constructive trust for the other and he is called a constructive trustee of the property. He is not compelled to convey the property because he is a constructive trustee; it is because he can be compelled to convey it that he is a constructive trustee."

The Court of Appeals in *Grimes v. Grimes,* 184 Md. 59, 40 A. 2d 58 (1944) said, at 61:

". . . [A] constructive trust is not based upon agreement, but is raised by construction of law, regardless of the intention of the parties, when land or other property is acquired by fraud, misrepresentation, imposition, or concealment, or under any other circumstances which render it inequitable for the holder of the legal title to retain it."

*Trossbach v. Trossbach,* 185 Md. 47, 42 A. 2d 905 (1945) stated, at 51:

". . . [A] constructive trust arises if (a) the conveyance was procured by fraud (or otherwise wrongfully) or (b) the transferee was in a confidential relation to the transferor."

Similar holdings are found in: *Shaffer v. Lohr,* 264 Md. 397, 287 A. 2d 42 (1972); *Siemiesz v. Amend,* 237 Md. 438, 206 A. 2d 723 (1965); *Fasman v. Pottashnick,* 188 Md. 105, 51 A. 2d 664 (1947); *Long v. Huseman,* 186 Md. 495, 47 A. 2d 75 (1946); *O'Connor v. Estevez,* 182 Md. 541, 35 A. 2d 148 (1943); *Eisinger Mill Etc. Co. v. Dillon,* 159 Md. 185, 150 A. 267 (1930); *Clark v. Clark,* 139 Md. 38, 114 A. 722 (1921).

We have no difficulty in holding that the evidence was

sufficient for the trial court to conclude that a constructive trust arose as a result of Dr. Hartsock's failure or refusal to do that which he ought to have done, namely, purchase from Dr. Strong's estate the "good will" of Dr. Strong and one-half of the other assets of the partnership. It is, of course, not necessary that there be fraud in order to give rise to the creation of a constructive trust. *Trossbach v. Trossbach, supra; Grimes v. Grimes, supra;* 26 R.C.L., *supra.* It is enough that the "conscience" of a court of equity would be traumatized if the legal title holder were allowed to deprive the beneficial owner of that which in good conscience belongs to the beneficial owner. *Beatty v. Guggenheim Exploration Co., supra.*

## II.

We find no merit in the appellant's contentions that the partnership agreement did not require that the insurance proceeds be used to buy out the partnership interest of the decedent's estate. The agreement provided in part:

"In order that each partner may have sufficient means or a substanted (sic) portion ready and available in cash when needed to consummate the purchase of the interest in the partnership business of the partner first to die, each partner will take out and name himself as beneficiary of an insurance policy on the life of the other partner in the amount of [$50,000] [2]. . . . If the purchase price . . . shall not exceed [$50,000], then it shall be paid in cash to the estate of the deceased partner within sixty (60) days from the date of death or within thirty (30) days from the date of qualification of a personal representative. . . . If said purchase price shall exceed [$50,000] then the first [$50,000] thereof shall be paid in cash as aforesaid and one-fifth of the balance shall be

---

2. The agreement read $20,000, but, as we have already noted, the Chancellor found as a fact that the agreement was amended by the actions of the partners.

paid in each succeeding twelve month period, with interest at the rate of five per cent (5%) on the unpaid balance until the full value of said deceased partner's share shall be paid in full. . . ."

It is apparent from the express language of the agreement as amended by the parties that the partners meant that the $50,000 insurance proceeds were to be used to purchase "good will" at a cost of $40,000, and the balance of $10,000 was to be applied toward the purchase price of the remaining partnership interest of the deceased partner's estate in the partnership assets.

### III.

Similarly we find no merit in the appellant's assertion that the failure to allege in the Bill of Complaint that the partnership agreement had been amended would justify the court's sustaining a demurrer, preliminarily, or the granting of a motion to dismiss at the conclusion of the plaintiff-appellee's case. The Bill of Complaint to which the partnership agreement was attached, and incorporated by reference, contained the allegation that the life insurance benefit had been increased "so that it would be commensurate with the value of the good will of the business", and an averment that a "proposed amendment was never formally executed, *but the partnership continued as if the same had been,* and the premiums for each insurance policy in the sum of $50,000 were paid directly from partnership funds." (Emphasis supplied.)

We think the language of the Bill sufficient to allege that the partnership agreement had been amended.

### IV.

Appellant argues that an unsigned copy of Roesser's letter of January 22, 1962 was erroneously admitted into evidence. Appellant grounds his argument upon the "Best Evidence Rule" which, he says, necessitated the production of the "original letter". The answer to the contention is that "[a] carbon copy of a letter is considered to be a duplicate

original, and, as such, it constitutes primary rather than secondary evidence." *Parr Construction Co. v. Pomer*, 217 Md. 539, 542, 144 A. 2d 69, 71 (1958); *see also Eastover Co. v. All Metal Fabr.*, 221 Md. 428, 158 A. 2d 89 (1960); *Morrow v. State*, 190 Md. 559, 59 A. 2d 325 (1948); *Goodman v. Saperstein*, 115 Md. 678, 81 A. 695 (1911).

## V.

The appellant contends that the Chancellor erred in admitting into evidence Roesser's testimony concerning his conversation with Richard Hartsock relative to the amendment to the partnership agreement. Even if we assume, as the appellant argues, that Roesser's testimony about his conversation with Richard Hartsock should have been excluded, the admission, without objection, of his memorandum in which he embodied the gist of his conversation with Richard Hartsock renders any error harmless.

## VI.

Appellant also avers that the Chancellor erred in excluding the testimony of Richard Hartsock in respect to two questions asked the witness by appellant's counsel. Objections to the questions were sustained, and appellant made no proffer as to what the witness's answers would have been. This Court will not speculate as to what the proffer would have contained or what appellant could have proved. There is nothing for us to review. Md. Rule 522 b. *Keys v. Keys*, 251 Md. 247, 247 A. 2d 282 (1968); *Leitch v. Anne Arundel County*, 248 Md. 611, 237 A. 2d 748 (1968); *Fowler v. Benton*, 229 Md. 571, 185 A. 2d 344 (1962); *Hughes v. Averza*, 223 Md. 12, 161 A. 2d 671 (1960).

## VII.

Lastly, the appellant contends that the estate of Dr. Strong is being unjustly enriched because not only will it receive the proceeds of the insurance policies, but that it still owns two insurance policies on the life of Dr. Hartsock. We decline to consider the issue because it was not raised in the

trial court, and it may not be raised for the first time on appeal. Md. Rule 1085.

*Decree affirmed.*
*Costs to be paid by the appellant.*