## BROWN, ET UX. v. BRADSHAW

[No. 90, September Term, 1966.]

526

*Decided February 15, 1967.*

The cause was argued before HAMMOND, C. J., and MAR-
BURY, OPPENHEIMER, BARNES and McWILLIAMS, JJ.

*William B. Dulany,* with whom were *James Willard Davis*
and *Dulany & Davis* on the brief, for appellants.

*Charles W. Bell,* with whom were *John T. Bell* and *Bell &
Bell* on the brief, for appellee.

McWILLIAMS, J., delivered the opinion of the Court.

The appellants (Brown)[1] own a building in Gaithersburg
which, on 18 March 1955, was leased to the appellee (Brad-
shaw) for a term of 5 years. According to Bradshaw the build-
ing soon became too small for his expanding business. He ac-
quainted Brown with his problem. Brown, being both sympa-
thetic and cooperative, employed an architect to develop plans
which would have doubled the size of the building but, said
Brown, "it worked out to more money than Mr. Bradshaw
wanted to tackle" and he [Bradshaw] "backed away from it."
Bradshaw thought he might be able to solve the problem him-
self if he could build on or otherwise use the vacant lot ad-
joining the building. The lot had been specifically excluded from
the lease.

On 11 March 1960, just before the lease expired, Brown and
Bradshaw [2] executed an agreement the effect [3] of which was to

1. For the sake of convenience the singular will be used.

2. Bradshaw's wife was a party to the extension agreement but
service of process against her was not accomplished.

3. The pertinent language of the extension agreement is as fol-
lows:

   "NOW, THEREFORE, in consideration of the premises,
   and the sum of One Dollar ($1.00) in hand paid, the re-

extend the lease for a term of 13 years and add the vacant lot to the leased premises. *Md. Theatrical Corp. v. Manayunk Trust Co.*, 157 Md. 602, 610-14, 146 Atl. 805 (1929). Bradshaw was given the right to terminate the lease during the last 3 months of the third year and, if not then terminated, during the last three months of the eighth year. Termination was to be accomplished by "notice in writing" of Bradshaw's "intention to vacate and surrender the premises." In the absence of such a notice he would continue to be bound by the lease. Bradshaw agreed also to pay more rent, all of the real property taxes and all of the hazard insurance premiums. "All other terms and conditions of the [original] lease * * * [were] declared to be a part" of the extension agreement.

On 28 December 1962 Bradshaw mailed to Brown the letter reproduced below. It will be noted that the third year of the extension expired on 31 March 1963. Brown received the letter on 2 January 1963 and that this was "within three (3) months of" 31 March 1963 is not disputed.

———————

ceipt of which is hereby acknowledged, the Landlords do hereby extend the term of said lease for a period of THREE (3) years beginning on the 1st day of April, 1960, and ending on the 31st day of March, 1963, to include in said lease the adjacent vacant lot specifically excepted therefrom, and do grant unto the Tenants the privilege of further extending said lease for two (2) five (5) year periods, namely, from the 1st day of April, 1963, to the 31st day of March, 1968, and from the 1st day of April, 1968, to the 31st day of March, 1973; it being understood that the Tenants shall have the right to improve the vacant lot in any reasonable manner, subject to the approval of the Landlords. The aforesaid extension shall be deemed automatic unless the tenants shall furnish the Landlords notice in writing within three (3) months of the expiration of said lease, or the first extension thereof, of their intention to vacate and surrender the premises at the end of the then existing term."

December 28th, 1962.

"Mr. R. Edwin Brown.
Jefferson & Monroe Streets,
Rockville, Maryland.
Dear Sir:

"I would like an entention [*sic*] on my present lease with you at, 302—East Diamond Avenue, Gaithersburg, Maryland through October 31st, 1963, at which time we will have vacated your property.

"After the first of the year (January 1963) I will give you a call and talk to you about this matter.

"I thank you for your past favors.

Sincerely yours,
/s/ M. W. Bradshaw
M. W. Bradshaw.
Western Auto Associate Store.
302—East Diamond Avenue,
Gaithersburg, Maryland."

Bradshaw went to see Brown between 8 and 12 January. He was alone, he said, but Brown thought he was accompanied by one of his employees. The conversation was "very brief." Brown told "Bradshaw that if he held over after the 31st of March that * * * [he] would hold him to the terms of the lease." He told Bradshaw, however, that although the lease did not give him the right to sublet the premises or assign the lease "without the written consent of the Landlords" he would give his consent if Bradshaw could get "a decent tenant." According to Brown Bradshaw replied, in substance, "if that's it, that's it." Brown said "they thanked me and left."

Bradshaw did not contradict Brown's statement that he would be held to the terms of the lease. He said he told Brown "the store just wasn't large enough" for him. In his testimony he said he "felt that the letter * * * [he] had sent him [Brown] was reasonable enough notice for me to discontinue rental from him at a later date and * * * [he] felt that he [Brown] would extend the lease." He admitted Brown told him he would be permitted to sublet if he "could find a tenant that he [Brown] was agreeable on."

Counsel for Bradshaw made much of the fact that Brown is an attorney and that he prepared both the original lease and the extension agreement. Whether, on either occasion, Bradshaw had the benefit of counsel is not a matter of record but there can be no doubt that counsel was available to him. What has greater significance, however, is the fact that Bradshaw consulted the attorney who appeared for him in this appeal *after* his conversation in January with Brown but *before* 31 March 1963.

Brown heard nothing more from Bradshaw but "sometime in the summer of 1963" Bradshaw's attorney told Brown that in his opinion the lease ran from year to year. Brown told him he was "all wet" and that he was "going to hold Bradshaw to" the terms of the lease except that he would let him sublet. On 17 September 1963 Bradshaw's attorney wrote the following letter to Brown:

"R. Edwin Brown, Esquire
260 East Jefferson Street
Rockville, Maryland

Re: Western Auto-Gaithersburg-Lease

Dear Ed:

"You will recall, that sometime ago I approached you on behalf of Murray Bradshaw regarding his lease with you for the Western Auto store in Gaithersburg. This followed Murray's earlier personal letter to you of December 28, 1962.

"As you may know, Murray has made an agreement with Lawson King to move into and occupy a more desirable property in Gaithersburg for his store. This new premises will be available sometime this coming spring and will alleviate for Murray the problems he has with the present location; being a shortage of floor space, a lack of merchandise loading space, and will give him facilities for tire changing and other work which he now does not have.

"I should like to advise you at this time, therefore, that Murray will vacate the premises now leased to him by you on or before March 31, 1964, which will

be the expiration of his current term as I view the lease. Of course, if Murray leaves prior to March 31, 1964, he understands he will be responsible for rent to that date.

"The purpose of writing you this far in advance is to give you all the notice possible so you may seek a new tenant for the building. We desire to cooperate fully in this matter, and we shall likewise attempt to find a new, prospective tenant. If you have any questions concerning this matter, please feel free to call me at your convenience.

> Very truly yours,
> /s/ Charles
> Charles W. Bell"

Brown's prompt reply follows:

"Charles W. Bell, Esquire          September 18, 1963
Attorney-at-Law
Kelley Building
Rockville, Md.,    20850

> In re: Murray W. and Ora B. Bradshaw lease

Dear Charlie:

"I wish to acknowledge receipt of your registered letter of September 17.

"I am obliged to advise you, as attorney for Mr. and Mrs. Bradshaw, that the present term of their lease with me will, upon proper notice, expire on the 31st day of March, 1968. In the absence of this notice, the term will ordinarily renew for an additional 5 year period. I advised Mr. Bradshaw of this when he called to see me here at my office last spring. I also advised him that he could sub-let the building with my consent; that I would not unreasonably withhold that consent, and that he should be prepared to continue with his lease whether he moved or not.

"I am at a loss to understand how you read into the

lease that the current term expires on March 31, 1964, and should appreciate your advice in this regard.

"With kindest regards, I am

Very truly yours,
R. Edwin Brown"

There was no response to Brown's letter of 18 September. Some time during the month of March 1964 Bradshaw, as predicted by his attorney, vacated the premises. He had the key delivered to Brown but Brown refused to accept it. Later on the key arrived in the mail but Brown did not return it. He said he "didn't see any sense in carrying it back up the street and putting it on Charlie's [Bradshaw's attorney] desk." He referred prospective tenants to Bradshaw and, on one occasion, he reminded Bradshaw of his obligation to maintain the property. When "it became obvious they [Bradshaw] weren't going to do anything" Brown tried "to find a new tenant."

In July 1964 Brown sued to collect the rent for April, May, June and July. In November, upon the petition and affidavit of Bradshaw, the case was removed to Carroll County. On 1 March 1965, after necessary repairs, Brown rented the property to Earl Daymude. In April 1965 Brown amended his declaration so as to claim rent from 1 April 1964 to 28 February 1965 ($2475), State and County taxes ($317.95), Gaithersburg Town taxes ($54.93) and the cost of the repairs ($1601.-40). The case was tried before Weant, J. and a jury on 30 November 1965. After the denial of Brown's motion for a new trial the clerk entered a judgment ($1000) on the verdict in his favor against Bradshaw.

## I.

The first of Brown's three contentions concerns Bradshaw's Prayer No. 1, which the court read to the jury and which follows:

"If you find from the evidence in this case that the landlord expressly or impliedly consented to the tenant remaining for a temporary period after the expiration of the term of the lease, or that the landlord and tenant were engaged in negotiations as to the renewal of the lease, then the landlord cannot hold the

> tenant for the full term of five years, but rather the landlord can treat the tenant as a trespasser or as a tenant from year to year."

We have found in the record no evidence which could support a finding that Brown agreed, expressly or impliedly, to allow Bradshaw to remain on the property for "a temporary period" after 31 March 1963. Bradshaw asked only for "an extension * * * through October 31st 1963." He went on to say, of course, that "we will have vacated your property" before 31 October but this was nothing more than an inducement to Brown to grant the extension. Brown's answer to this request was short and emphatic and it has not been contradicted. Moreover Bradshaw admitted, when he testified, that Brown told him he was willing to relax the prohibition against subletting, a concession quite inconsistent with the language of the prayer. Nor do we find any evidence that Brown and Bradshaw were engaged in "negotiations as to the renewal of the lease." We think "negotiations" connotes something more than the flat refusal of a simple request. *Attrill v. Patterson,* 58 Md. 226, 245 (1882). See also the quotation from *Tonkel v. Riteman,* 163 Miss. 216, 141 So. 344 (1932) in *Donnelly Adver. Corp. v. Flaccomio,* 216 Md. 113, 123-4, 140 A. 2d 165 (1958). In any event, there was no need to negotiate for the "renewal of the lease." The lease was in full force and effect and it was not about to expire. *Felting Etc. Co. v. Waltz,* 160 Md. 50, 152 Atl. 434 (1930).

After the conversation in Brown's office early in January Bradshaw had available to him two alternatives. He could have given Brown proper written notice of his intention to terminate the lease or, by standing mute, he could have allowed the lease to move automatically into its next stage. Since he consulted counsel it must be assumed that his choice of the latter alternative was deliberate and intentional. If, however, as the record seems to suggest, he was advised that his letter of 28 December was notice sufficient to terminate the lease on 31 March 1963, we think he was given incorrect advice. In our judgment, to say that asking for a concession not contemplated by the lease has the same effect as giving the notice of an intention to terminate required by and described in the lease is quite like

confusing chalk with cheese. Had he pursued the other alternative (i.e., terminated the lease by proper notice) he could have remained in possession, leaving the next move to Brown. This would have forced Brown to elect whether to treat him as a tenant from year to year or to proceed against him, as a tenant holding over, in the Montgomery County People's Court under the provisions of Code, Art. 53, § 1 or in the Circuit Court under Maryland Rule T 40. *Messall v. Merlands Club,* 244 Md. 18, 29, 222 A. 2d 627 (1966).

Bradshaw does not contend that Brown was negligent or dilatory in mitigating his damages or that he did not act in good faith. Nor was any such showing made in the court below. In the circumstances we think Brown was entitled to his rent for the 11 months the property was without a tenant and the trial judge should have so instructed the jury. It follows, of course, that Bradshaw's Prayer No. 1 should not have been granted.

## II.

Brown next contends that the trial judge should not have granted Bradshaw's Prayer No. 4, which follows:

"When a landlord has the election as to whether he will treat a tenant holding over after the expiration of his term as a trespasser or as a periodic tenant, the landlord is required to make his election known to the tenant within a reasonable time *and it is up to you to determine whether such election was made known to the defendant.*"

When Judge Weant read Prayer No. 4 to the jury he added the italicized language. As indicated in our discussion of Brown's first contention there is no evidence in this case to which such an instruction could be applied. Since Bradshaw's term had not expired he could not be treated as a tenant holding over. There being no election for Brown to make there was nothing to make "known to the defendant." The instruction was inappropriate.

## III.

Brown's final contention is that Bradshaw's Prayer No. 3, which the court read to the jury, ignores a covenant in the

lease which requires the tenant to "maintain said building as well as the heating, plumbing and electrical systems therein, in a good state of repair." Prayer No. 3 follows:

> "In order for the landlord to recover from the former tenant the amount expended for repairs and reconditioning the building because of an alleged breach of a covenant concerning the condition of the premises at the termination of the tenancy, the landlord must show that the covenant has been breached and a connection between that breach and the need for repairs.
>
> "If you find that the repairs made upon the property, after the tenant vacated it, were required because of reasonable and proper use, then you must find for the defendant as to the damages claimed for such repairs."

Brown argues that, since the jury awarded him only $1000 of the $1601.40 he says he proved, he must have been prejudiced by the instruction. We doubt that this is so because the court granted two instructions offered by Brown both of which recognize reasonable wear and tear as a proper exception to Bradshaw's duty to return the premises "in as good condition as they were on April 1, 1955." In our judgment Bradshaw's Prayer No. 3 is a reasonably compatible paraphrase of Brown's Instructions Nos. 8 and 9. Even if it could be said that the granting of the Bradshaw prayer was tinged with error, the error is harmless.

## IV.

Bradshaw insists that we cannot consider Brown's contentions because his objections to the court's instructions were made *before* they were read to the jury. Bradshaw is catching at straws.

At the conclusion of the evidence Brown offered 9 "instructions." Bradshaw offered 4 "prayers." Judge Weant told counsel that he would grant all of Brown's "instructions" except No. 1 and No. 7. He announced also that he would grant all of Bradshaw's "prayers." When he asked if there were any exceptions, Brown's attorney dictated to the reporter his exceptions, and the grounds thereof, to the granting of Bradshaw's

Prayers 1, 3 and 4. After the jury returned to the court room Judge Weant read, verbatim, the granted prayers and instructions to the jury. He made a few minor additions none of which are material to issues before us. Otherwise the court made no comment. There were no objections made after the court's charge.

Bradshaw cites, in support of his argument, Maryland Rule 554 d, the language of which follows:

> "If a party has an objection to any portion of any instruction given, or to any omission therefrom, or to the failure to give any instruction, he shall before the jury retires to consider its verdict make such objection stating distinctly the portion, or omission, or failure to instruct to which he objects and the ground of his objection. Opportunity shall be given to make the objection in open court out of the hearing of the jury upon application either orally or in writing, made before or after the conclusion of the charge."

Counsel must surely have misread the rule, which states with precise clarity that the objection (exception) may be made *"before or after* the conclusion of the charge." (Emphasis supplied.) *Ritterpusch v. Lithographic Plate,*[4] 208 Md. 592, 119 A. 2d 392 (1956) is also offered in support of Bradshaw's argu-

---

4. When *Ritterpusch* was decided the language of the rule was as follows: "(c) *Objections.* Before the jury retires to consider its verdict, any party may object to any portion of any instruction given or to any omission therefrom or to the failure to give any instruction, stating distinctly the portion or omission or failure to instruct to which he objects and the specific grounds of his objection. Opportunity shall be given to make the objection out of the hearing of the jury. (d) *Appeal.* Upon appeal a party, in assigning error in the instruction, shall be restricted to (1) the particular portion of the instructions given or the particular failure to instruct distinctly objected to before the jury retired and (2) the specific grounds of objection distinctly stated at that time; and no other errors or assignments of error in the instructions shall be considered by the Court of Appeals." Rule III, Trials, Rule 6, Instructions To The Jury (c) and (d). The rule above quoted was replaced in 1961 by Rule 554 d (the present rule) the last sentence of which was added to achieve conformity with Rule 756 f.

ment. Judge Hammond (now Chief Judge, in that case, re-marked:

> "Clearly, the controlling objection and the one to which appellate review is restricted, is that made *after* the charge has been delivered." (Emphasis supplied.) *Id.* at 602.

Counsel neglects to point out, however, that the appellant in *Ritterpusch* was caught between conflicting legal theories, one raised by his request for an instruction which was refused and the other by the exception taken after the charge. In those circumstances, we held, the objection made after the charge, rather than the refused instruction, was the subject of appellate review. Since there were no objections made after the charge in the instant case, we have nothing before us except those made before the charge. In any event, it will readily be perceived that where the trial judge confines his charge to the reading of the prayers and instructions offered by counsel it matters little whether the objection is registered before or after the reading. *Merritt v. Darden,* 227 Md. 589, 596-98, 176 A. 2d 205 (1962). See *Town of Somerset v. Montgomery County Board of Appeals,* 245 Md. 52, 225 A. 2d 294 (1966).

## V.

The manner in which the trial judge instructed the jury in this case, while technically permissible under Maryland Rule 554, prompts us to repeat what we said in *Coca-Cola Bottling Wks. v. Catron,* 186 Md. 156, 163, 46 A. 2d 303 (1946) :

> "The practice adopted by the trial court in the case at bar, of granting prayers and supplementing them by an oral charge, does not commend itself to us, even though it is permitted by rule. We think the better practice, and the one least calculated to mislead the jury, is for the court to refuse all prayers, and make an oral charge, incorporating therein such portion, or all, of the requested instructions as the court may deem proper."

In this connection a useful purpose may well be served by recalling fragments of a paper prepared by the late Morris A.

Soper [5] at the time of the promulgation of the predecessor of Rule 554.

"It is to be expected that at the close of the evidence, if not before, the judge will follow the usual salutary practice of asking counsel to submit the propositions of law which they desire him to include in his charge. It is likely that counsel will prefer to offer formal prayers, as has been their custom, setting out with precision the applicable rules of law in a hypothetical framework of facts. The judge may incorporate one or more of the prayers, as offered, in his charge, accompanying them with explanatory comments, or as is not infrequently and, some think, preferably done, he may reject all of the prayers, and yet use in his own words such of the offered material as constitutes a correct exposition of the law. The jury will more easily understand and more readily apply the rules of the law if they are couched in simple colloquial terms, with appropriate illustration and application to the facts of the controversy. Any lawyer, however able, who attempts to read the black letter of the Restatements of the Law, prepared by the leaders of the profession under the direction of the American Law Institute, realizes how difficult it is to understand the text without reference to the accompanying comment. How much more are jurors in need of lucid explanation. Moreover, there is an obvious advantage in a charge which contains all of the comments on the facts and all of the instructions on the law in one coherent statement."

\* \* \*

"The privilege and duty of charging the law in simple

5. Asst. State's Atty., Baltimore City, 1897-99; Asst. U. S. Atty. Dist. of Md., 1900-10; President, Bd. of Police Comm'rs of Baltimore City, 1912-13; Chief Judge, Supreme Bench of Baltimore City, 1914-21; President, Md. Bar Assn., 1920; U.S. Dist. Judge, Dist. of Md., 1923-31; U.S. Cir. Judge for the 4th Judicial Circuit, 1931-63 (retired 1955-63). Judge Soper was for twenty years a strong and effective advocate for improved judicial administration.

understandable terms should also be accepted without hesitation. The judge need have no fear that his deliverance will be condemned because it is not phrased in formal, technical language, or because each sentence separated from the context does not state a rule of law completely with all its exceptions and qualifications. Such a feat, well nigh impossible, would have small practical value, if performed. The jury needs to have its attention called to the substance of the rules in every day language, with application to the facts of the instant case, and, if possible, with pertinent illustrations. Here too the judge may expect helpful suggestions from counsel at the end, which will enable him to correct errors of commission and omission. Finally, the judge may be reassured by the evident purpose of our highest court to ascertain in each jury trial under review, not whether all the refinements of the law have been observed, but whether justice in a practical sense has been done." *Charge to the Jury,* 6 Md. L. Rev. 43, 48 (1941).

## VI.

For the reasons herein expressed we shall reverse the judgment of the trial court and remand the case for further proceedings. Unless the parties can agree otherwise it will be necessary to impanel another jury to resolve Brown's claim for repairs to the property, now the only remaining issue. The trial judge will instruct the jury that Brown is entitled to rent in the amount of $2,475.00, State and County taxes in the amount of $317.95 and Gaithersburg taxes in the amount of $54.93, and that he is entitled to interest on these amounts from the date they became due and payable. *Dennison v. Lee, et ux.,* 6 G. & J. 383, 386 (1833); *Thomas v. Cincinnati, N. O. & T. P. Ry. Co.,* 81 F. 911, 918 (S.D. Ohio 1897); *Trans-Lux Radio City Corp. v. Service Parking Corp.,* 54 A. 2d 144, 147 (D. C. 1947); *Robert C. Herd & Co. v. Krawill Machine Corp.,* 256 F. 2d 946, 952 (4th Cir. 1958), affd. 359 U. S. 297 (1959). The trial judge will also instruct the jury that they may allow interest on whatever sum they may find Brown is entitled to receive for the repairs, in such an amount as they,

540

in their discretion, shall find to be fair and equitable in the circumstances. *Robert C. Herd & Co., supra; Carroccio v. Thorpe,* 230 Md. 457, 466, 187 A. 2d 678 (1963).

*Judgment reversed.*

*Case remanded for the further pro- ceedings directed in this opinion. Appellee to pay the costs.*