CERTAIN-TEED PRODUCTS CORPORATION ET AL.
*v.* GOSLEE ROOFING & SHEET METAL, INC.

[No. 836, September Term, 1974.]

*Decided June 2, 1975.*

454

The cause was argued before THOMPSON, DAVIDSON and MASON, JJ.

*Donald E. Sharpe* and *Edward S. Digges, Jr.*, with whom were *Piper & Marbury* on the brief, for appellant-cross-appellee, Certain-Teed Products Corporation.

*J. Thomas Caskey* and *James P. Garland*, with whom were *Semmes, Bowen & Semmes* on the brief, for appellant-cross-appellee, The Dow Chemical Company.

*Victor H. Laws* and *George J. Goldsborough, Jr.*, for appellee-cross-appellant, Goslee Roofing & Sheet Metal, Inc.

THOMPSON, J., delivered the opinion of the Court.

On May 21, 1970, Goslee Roofing & Sheet Metal, Inc. (Goslee), seeking to recover damages resulting from its re-roofing of Chesapeake College, brought an action in the Circuit Court for Queen Anne's County against Certain-Teed Products Corporation (Certain-Teed), the Dow Chemical Corporation (Dow), Charles E. Brohawn & Bros., Inc. (Brohawn) and McLeod, Ferrara & Ensign, A.I.A. (McLeod). Goslee's cause of action was based primarily on negligence in manufacture of and breach of warranty in connection with the roofing materials originally sold to it by Certain-Teed and Dow and negligence in construction and design against Brohawn (the general contractor) and McLeod (the architect).

On October 28, 1970, Certain-Teed filed a counterclaim against Goslee for the unpaid purchase price of the products sold to Goslee for the purpose of re-roofing Chesapeake College. The case was subsequently removed to the Circuit Court for Talbot County on May 26, 1971.

Trial commenced on January 3, 1973 and concluded on January 12, 1973. Goslee dismissed its case against McLeod prior to trial. On March 5, 1974 Judge Harry E. Clark found against Certain-Teed on the issue of warranty and against Dow on the issues of warranty and negligence. Judgments were entered in favor of Goslee against Brohawn for $3,207.19 and against Certain-Teed and Dow for $73,204.34. A judgment was also entered in favor of Certain-Teed on its counterclaim against Goslee. Goslee has not appealed that judgment nor has Brohawn appealed the judgment entered against it.

Certain-Teed claims that any warranty created by its sale to Goslee was not breached, that even if a breach occurred it was not the proximate cause of the damages suffered by Goslee, and that the trial court erred in its compilation of damages. Dow claims that the trial court erred in refusing to allow it to call an expert witness, that Goslee was under no legal obligation to re-roof and thus should not have been awarded damages for doing so and that the lower court erred in its compilation of damages. In its cross-appeal Goslee claims that certain items should have been included in its damage award against Certain-Teed and Dow.

## FACTS

In the spring of 1967, Chesapeake Community College awarded a contract to build the college's first five buildings to Brohawn, the general contractor. In September 1967, Brohawn accepted the proposal of Goslee, a roofing and sheet metal contractor, to provide build-up roofs for all five of said buildings at and for the sum of $64,000.00. This sub-contract required Goslee to furnish all labor, materials and equipment necessary to build and complete the roofs in accordance with the owner's plans, specifications and addenda, if any, as prepared by McLeod. The original plans

and specifications for the roofs called for a build-up roof to be installed over the concrete slab roof deck. The roof was to be comprised of a layer of insulation to be attached to the roof deck and a conventional four-ply twenty-year bonded type membrane roofing system with an aggregate surface to be attached to said insulation.

In October 1967, Billy N. Beauchamp, Certain-Teed's territorial manager, contacted David B. Webster, Goslee's General Manager and Estimator, in an attempt to sell Certain-Teed's Dual 80 GSI roof system, which involves the use of two plies of forty pound asphalt coated felt, instead of the four-ply contained in the specifications described above. During the same period one Joseph Baxter, a salesman for G. & W. H. Corson Co., the exclusive distributor of Dow's products in the Mid-Atlantic States, attempted to sell Dow's Styrofoam RM brand plastic foam as the substrate and insulation for the roofs. Webster testified that he told Beauchamp and Baxter that if they could convince the architects to substitute their products for those in the specifications, Goslee would use them on the Chesapeake College project. Thereafter a meeting was held in McLeod's offices in Washington, D.C., between Robert S. Tomlinson, McLeod's architect-in-charge of the Chesapeake College project, a Mr. Vercoe, a representative of Corson, and Billy N. Beauchamp.

The trial court aptly summed up the testimony relative to this meeting:

"From the depositions of Vercoe and Beauchamp, which were admitted into evidence, it appears they attended this meeting for the sole purpose of persuading McLeod to approve the use of Certain-Teed's Dual 80 GSI roofing system and Styrofoam RM for subject job. Vercoe reported that Styrofoam RM was as good an insulator and foundation or substrate for an asphalt coated membrane roof system as any on the market and had the added advantage of being more water resistant, thus making it slower to

deteriorate with the passage of time and exposure to moisture. Beauchamp reported that since Certain-Teed's Dual 80 GSI roofing system was only a two-ply system, it would be cheaper for the roofer to apply, since it would take less time and labor to apply and thus would enable the general contractor to start inside work sooner than if the conventional four-ply system was used (a coated base sheet with three plies of fifteen pound felt) which Certain-Teed also manufactured. Each deponent admitted that this was the first time he had proposed the use of Certain-Teed's Dual 80 GSI roofing system in conjunction with Styrofoam RM."

Mr. Tomlinson testified as to that meeting as follows:

"Q. Can you or not give us the substance of that?

A. Well, first we had not used the Dual 80 roofing or its type recently and we were most concerned with the adequacy of the type of material for a four ply built-up roof, and this was our first concern. Secondly there was a cause for concern because of the compatability of the insulation because the manufacturer's literature seemed to caution against this type of use."

\* \* \* \*

"A. As I say, primarily we were concerned with the results of this but also concerned with the compatability. We were given the names of two or three jobs where Certain-Teed was used. I did some telephone checking on that. I had some notes but I have since destroyed them, and I can't give any particular reference, but we were concerned about other situations elsewhere and did check those. We found nothing derogatory and nothing to indicate we should be alerted to any problem and, on that basis, found no objection to Certain-Teed. We asked Dow to certify that they had no objection to using

their products of Certain-Teed and, with that letter, we proceeded to approve it."

\* \* \* \*

"Q. Mr. Tomlinson, was or did the specifications for this job include the requirement that the built-up roof be bondable, that is, that the owner be eligible to obtain a bond should it elect to do so?

A. That's correct.

Q. And the bond was to have been what type of bond in terms of nature and duration?

A. Twenty years on the roofs which were not flashed, which is common in the trade, furnished by the roofing manufacturer, the manufacturer of the roofing service products.

Q. In this case that would have been which firm?

A. Certain-teed.

Q. Was the bondability feature discussed with the Certain-Teed representative at the time?

A. I am quite sure it was because this was a cause of concern in evidencing that this substitution would be equal to that which was specified in having the 20 year life.

Q. Was it one of your objectives in making an investigation and inquiry into Dual 80 that Certain-Teed be willing to bond any material in this application on a 20 year bond specification?

A. I am quite sure it was. I can't remember exact conversations but this was the tone of all concerned, durability and, therefore, bondability."

The architect did approve the use of Certain-Teed's and Dow's materials; Goslee thereupon purchased and used both products. Goslee began roofing the library at Chesapeake College on April 15, 1968, the Science Building on June 17, 1968, the Humanities Building on August 22, 1968, the Gymnasium on October 8, 1968 and the College Center on November 19, 1968. Each building's roof took approximately one month to complete.

On March 13, 1969, Goslee was notified of leaks in the roofs of the Library, Science and Humanities Buildings. Goslee inspected these roofs and found a number of splits in the membrane along the longitudinal joints of the substrate. In June 1969, due to pressure from the owner and general contractor, Goslee attempted to correct the leaks by removing the loose slag in the areas where the splitting had occurred and flooding those areas with asphalt. Less than 3 months after this action, however, the leaks reappeared. Goslee, on the continued urging of Chesapeake College and Brohawn concerning corrective action, sought the advice of Certain-Teed personnel. Goslee then re-roofed the three buildings in accordance with Certain-Teed's advice during the fall of 1969. In the meantime Goslee received complaints that the roofs of the Gymnasium and College Center Building were leaking due to the same type of splitting in the membrane as had been encountered in the other three buildings. On May 5, 1970, Tomlinson requested Brohawn to take immediate steps to replace the roofs of the Gymnasium and College Center. This letter failed to achieve the desired result and Tomlinson wrote another letter dated July 17, 1970 which read as follows:

"In our letter of 5 May you were requested to take immediate steps to completely replace the roofs on the College Center and the Physical Education Buildings, since both of these roofs have now shown the expected deterioration, failure and interior damages. To date we are not aware that any efforts have been made to comply with the requests of that letter.

"You are, therefore, notified, in accordance with the terms of the Contract as stated above, that unless work has been started on the complete replacement of the roofs on the College Center and Physical Education Buildings on or before 3 August 1970, the Owner will exercise his right to carry out the work and employ another roofing firm to provide the necessary roofing and insulation replacements. This notice to you complies with the terms of the

> Contract in that at least 7 days will have elapsed from the time which you received it and the time that other steps will be taken to provide satisfactory work as required by the conditions of your Contract.
>
> * * * *"

After the contents of this letter were disclosed to Goslee, it commenced within the time limit to re-roof these buildings in the same manner it had re-roofed the others. The re-roofing procedure substituted fiber-glass insulation for Dow's Styrofoam RM; Certain-Teed's Dual 80 felts were again used.

### Certain-Teed's Appeal

A. *The Warranty and the Breach*

· Certain-Teed claims that it breached no warranty running to Goslee. Goslee on the other hand claims that all three of the traditional warranties were breached by Certain-Teed. We find that Certain-Teed did give and breach an implied warranty of fitness for a particular use.

Md. Code, Art. 95B, § 2-315 defines the implied warranty of fitness for a particular use:

> "2-315. Implied warranty; fitness for particular use; applicable to lease and bailment of goods.
>
> (1) Where the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is unless excluded or modified under the next section an implied warranty that the goods shall be fit for such purpose."

The particular use envisioned by Goslee was that Certain-Teed's membranes when used in a built-up roofing system in conjunction with Dow's substrate would produce a 20 year bonded roof. One of the Goslee experts, Stafford,

testified that Certain-Teed's Dual 80 GSI was inherently too weak to survive normal weather conditions for twenty years and therefore should not be used for a roof that must qualify for a twenty-year bond. To qualify for a twenty-year bond the membranes should have a tensile strength of 110-120 pounds per lineal inch, whereas, Certain-Teed's Dual 80 GSI's tensile strength is only 50-58 pounds per lineal inch. Robert E. Link, President of the National Roofing Contractors Association, testified that according to a survey conducted by that organization, there were ten times the number of problems reported on two-ply coated systems than on all other built-up roofing systems. Another expert produced by the plaintiff, Edward M. Ream, a roofing contractor, stated that he had ceased using Certain-Teed's two ply system and Dow's Styrofoam RM due to several leakage problems he had encountered in the past. This evidence makes clear the fact that Certain-Teed's product was not fit for the particular use required by Goslee.

Certain-Teed attempts to escape liability in a number of ways. First it argues that the particular use was not communicated to it by Goslee and that thus the warranty was not created. This proposition is clearly incorrect in light of comment 1 to § 2-315 which provides as follows:

> "1. Whether or not this warranty arises in any individual case is basically a question of fact to be determined by the circumstances of the contracting. Under this section the buyer need not bring home to the seller actual knowledge of the particular purpose for which the goods are intended or of his reliance on the seller's skill and judgment, if the circumstances are such that the seller has reason to realize the purpose intended or that the reliance exists. The buyer, of course, must actually be relying on the seller."

See Myers v. Montgomery Ward & Co., 253 Md. 282, 295, 252 A. 2d 855 (1969), quoting from Hawkland, A Transactional Guide to the Uniform Commercial Code (1964) § 1.19020702. In the instant case it is clear that Certain-Teed's agents had

reason to know and, in fact, did know of the particular use contemplated by Goslee.

Certain-Teed also argues that Goslee could not have relied on Certain-Teed's expertise or skill because it was not represented at the conference with the architect when Certain-Teed's product was approved. This argument is a complete non-sequitur as a representative of Certain-Teed originally contacted Goslee in an attempt to substitute Certain-Teed's product for that called for in the specifications. The testimony of Goslee's general manager, Webster, that he told Certain-Teed's salesman, Beauchamp, that if he, Beauchamp, could convince the architect to substitute Certain-Teed's product, Goslee would go along shows sufficient reliance by Goslee.

Certain-Teed argues that reliance on its skill by Goslee was nonexistent because the architect performed his own investigation. The obvious answer to this contention is that any investigation was done by the architect, not Goslee. We are also constrained to point out that the investigation, which consisted of the architect contacting several companies which had used Certain-Teed's product and whose names were supplied by Certain-Teed's representative, was not such that it would negate reliance. *Compare Shay v. Joseph*, 219 Md. 273, 149 A. 2d 3 (1959), where the Court found a lack of reliance because the purchaser had performed tests on the seller's product for three weeks prior to the sale and because it had specifically relied on those tests in deciding to buy.

Certain-Teed also argues that no breach occurred because its product was at all times eligible for a 20 year bond which it claims was all that was warranted. This contention was fully answered by the trial court:

"In its effort to escape liability, Certain-Teed raises two other points, the first of which is that it had fully discharged its obligation to Goslee when it signified its willingness to bond the roofs as soon as they had been completed and would have done so had the owner been willing to pay the premium for

such a bond. This argument is specious to say the least, for, as we view it, Certain-Teed's warranty of fitness for this particular purpose meant that its membrane applied over Styrofoam RM would provide a water-tight roof for a period of twenty years regardless of whether or not it was bonded. The promised performance of the Dual 80 GSI two-ply roofing system was in no way conditioned on the purchase of a bond."

Certain-Teed's final attempt to escape is grounded on its contention that roofing industry custom has established that all that a seller warrants is that a bond will be issued on request and not that a roof will not leak. From this basis it argues that any warranty it may have given to Goslee was excluded or modified under Md. Code, Art. 95B, § 2-316 (3) (c). While that section clearly provides for the exclusion or modification of warranties in certain cases, this is not one of them. Here our review of the record shows that Certain-Teed did not establish that the custom of the trade is as it alleges. There was therefore no modification.

B. *Causation*

Certain-Teed contends that Goslee failed to show that the breach of warranty by Certain-Teed was the proximate cause of the injuries suffered by Goslee.

In a cause of action based on breach of warranty a plaintiff must show, as in typical negligence cases, that the breach was the proximate cause of the harm suffered. Comment 13, Art. 95B, § 2-314. The two-step judicial procedure to determine what is or is not a proximate cause was described in *Peterson v. Underwood*, 258 Md. 9, 16-17, 264 A. 2d 851 (1970):

"It should be clarified at this point that our inquiry is directed specifically to the issue of 'causation in fact' which has been regarded as an aspect of 'proximate cause.' W. Prosser, *Handbook of the Law of Torts*, § 41, at 240 (3d ed. 1964), 2 F. Harper and F. James, *The Law of Torts*, § 20.2, at 1110 (1956). Proximate cause ultimately involves a

conclusion that someone will be held legally responsible for the consequences of an act or omission. This determination is subject to considerations of fairness or social policy as well as mere causation. Thus, although an injury might not have occurred 'but for' an antecedent act of the defendant, liability may not be imposed if for example the negligence of one person is merely passive and potential, while the negligence of another is the moving and effective cause of the injury. *Bloom v. Good Humor Ice Cream Co.*, 179 Md. 384, 18 A. 2d 592 (1941), or if the injury is so remote in time and space from defendant's original negligence that another's negligence intervenes. *Dersookian v. Helmick*, 256 Md. 627, 261 A. 2d 472 (1970); *Liberto v. Holfeldt*, 221 Md. 62, 155 A. 2d 698 (1959).

"Causation in fact is concerned with the more fundamental (and some have thought meta-physical) inquiry of whether defendant's conduct *actually* produced an injury."

The expert testimony regarding causation came from Goslee's witness, Robert M. Stafford. Due to its importance we quote from it at length:

"Q. Did you make any observations and come to any conclusions with respect to the two ply membrane in terms of its strength or ability to resist the stresses to which it was subjected under the thermal expansion you have just described?

A. Well, obviously it couldn't resist the stresses that were applied by the movement of the sub-straight in this instance because it failed, therefore the strength was exceeded. A two ply membrane is a relatively week membrane insofar as built up roofing membrane is concerned. The strength actually is probably something less than 50%, and I am speaking of tensile strength, is probably something less than 50% of that of a four

ply roof. There has been a great deal of research and thought and experimentation in the area of how much strength a built up roof needs, and while I really can't say there has been definitive answers reached in this matter, it is pretty generally the opinion of those people who have worked in this area that a built up roof should have a strength of somewhere in the neighborhood of 110 to 120 pounds per inch. The two ply roof runs somewhere in the neighborhood of 50-58 pounds per inch of tensile strength so, based upon the studies, as well as experience over the years, it is my opinion that the two ply roof doesn't have the strength that is normally required to withstand normal stresses in any built up roof membrane.

The Court: That's 110 to 120 pounds per inch?

A. Yes, sir, that's per lineal inch actually. This is probably the explanation for the early failure, relatively early failure in this roof. It is my opinion that at some time under these same conditions, if a four ply roof had been applied, that four ply roof would have ruptured also. However, I don't believe it would have been that early. Normally it would have taken several years for this to occur.

Q. Mr. Stafford, to guard against the possibility that there can be any misunderstanding or misinterpretation of your opinion, I would ask you again if you would summarize for us now your opinion as to the primary cause of the failure of this roof?

A. The primary cause of failure was the movement of the insulation which resulted in rupturing of the roof membrane. The roof membrane fractured earlier in its life than would normally have been expected because of the relatively inherent weakness of the membrane.

* * * *

Q. Now we spoke earlier of this opinion which

you gave us as to the primary cause of the failure of this roof. Were there, in your judgment, any secondary causes and, if so, what were they?

A. I really don't know of any causes that we could classify as a secondary cause. Of course, the primary cause is rather broad and you might say what effect brought on the primary cause and consider it a secondary cause. I would not consider it that way. The single cause of the failure was the movement of the insulation. Now, so far as I know, there was no other factor involved in the failure except for contributing factors.

Q. Well, I used the word secondary intending it to mean synonymous with contributing. Were there any other contributing factors that operated as a proximate cause of this failure?

Mr. Sharpe: I object to proximate cause. That's legal question for Your Honor to decide.

Mr. Wood: There is no showing the witness knows what the word proximate cause means.

Mr. Goldsborough: You understand what proximate cause means?

A. I thought I did until this conversation, and now I am not so sure. Maybe you better enlighten me.

Q. Well, proximate cause simply means a cause which directly leads to the consequences under consideration.

A. Thank you.

Q. Were there any other contributing causes to this roof failure in your judgment and opinion?

A. No. In my opinion there were not. Again I must add that this is possibly an arguable answer but because of the opinion that someone might place upon significance of cause, but it is my opinion that there was no other significant cause and, well, that's it.

The Court: I had understood you to say that the

lack of tensile strength of the membrane was a cause.

A. This was a cause of the timing of the failure. I do not think that it was an actual cause of the failure. In other words, if there had been a stronger roof on here, a conventional four ply roof, for instance.

The Court: You said it would only last three or four years and this roof was built to last twenty?

A. That's correct, so from that point of view perhaps it could be interpreted as a contributing cause. I think it is a question of what I feel is contributing and what is time.

Q. Let's try it this way, Your Honor, if we may, Mr. Stafford. Assume that the plans and specifications and the general conditions of this contract supplied the roofer, Goslee Roofing, to furnish a water tight built up roof that would qualify for a twenty year bond, now would the physical properties of the membrane in this instance of Certain-Teed Dual 80 contribute as a cause to the failure of this roof to survive as a water tight entity for twenty years?

\* \* \* \*

A. Yes.

Q. In what respect and to what extent?

A. In the respect that if there had not been the movement in the insulation which we have noted or, in other words, if the insulation in the sub-straight had been stable, it is my opinion that the Certain-Teed Dual 80 would not have lasted trouble free for a period of twenty years.

Q. Why?

A. Because it is not a suitable membrane for a twenty year built up roof.

Q. By reason of its physical properties?

A. It is inherently too weak to survive the

normal weather conditions that would be encountered during that period of time."

The gist of Stafford's opinion was that the unsuitability of Certain-Teed's roofing membrane for built-up roofs in conjunction with the movement of Dow's insulation combined to cause the leaks. Stafford also stated that the movement of the insulation would have caused leaks even if suitable membranes had been used but that such leaks would not have occurred until three or four years after installation.

The law in Maryland relative to concurrent or contributing causes was set out in *Baltimore Transit Co. v. Bramble,* 175 Md. 334, 349, 2 A. 2d 416 (1938):

> " 'As a general rule, it may be said that negligence, to render a person liable, need not be the sole cause of the injury. It is sufficient if his negligence concurring with one or more efficient causes other than the plaintiff's fault, is the proximate cause of the injury. So that where several causes combine to produce injuries, a person is not relieved from liability because he is responsible for only one of them, it being sufficient that his negligence is an efficient cause, without which the injury would not have resulted to as great an extent, and that such other cause is not attributable to the person injured.' "

*Yellow Cab Co. v. Bonds,* 245 Md. 86, 90-91, 225 A. 2d 41 (1966); *Armiger v. Baltimore Transit Co.,* 173 Md. 416, 196 A. 111 (1938); *Brawner v. Hooper,* 151 Md. 579, 135 A. 420 (1926).

A slightly different description of this rule was given in *C. & P. Telephone Co. v. Noblette,* 175 Md. 87, 199 A. 832 (1938), where the Court stated at 92:

> "Nevertheless, should it be established by the plaintiff that the fire would not have been produced by the stroke of lightning had there not simultaneously existed a condition at the mill which

was the result of the telephone company's neg-
ligence and which, in combination with the
stroke of lightning, was the proximate cause of the
fire which consumed the mill and its contents, the
plaintiff would be entitled to recover against the
telephone company for its neglect."

The Court went on to cite cases from 17 other jurisdictions
which had embraced the rule.

We find the facts of the case at bar bring it within the
above-described rule. The inadequacies of both Dow's and
Certain-Teed's roofing products acted together to produce
the harm eventually suffered by Goslee.

Certain-Teed relies heavily upon the general rule that an
actor is not responsible for his negligent actions if the harm
suffered would have occurred regardless of the actor's
negligence. It cites Illustration 2 to Section 432 (1) of the
Second Restatement of Torts in support of its argument:

"A dams a stream running through his own land.
The dam is negligently constructed in that it is not
sufficiently strong to confine the water from the
freshets which occur from time to time in the
spring. A sudden cloudburst of unprecedented
severity sweeps the dam away, causing the water
collected by it to overflow the land of B. The flood
caused by the cloudburst is so great that it would
have burst the dam even had it been properly
constructed. A's negligent construction of the dam
is not a cause of the inundation of B's land."

While we accept the general principle set forth in § 432 (1)
and the illustration, we find it inapposite to the facts of the
instant case. That principle, as typified by the illustration,
can only apply where the injury would have occurred *at the
same time* regardless of the actor's negligence. It thus does
not apply in cases such as the case at bar, where the harm
occurred sooner because of Certain-Teed's breach than it
would have otherwise.

One other section of the Restatement of Torts lends support to our conclusion. Section 439 reads as follows:

"If the effects of the actor's negligent conduct actively and continuously operate to bring about harm to another, the fact that the active and substantially simultaneous operation of the effects of a third person's innocent, tortious, or criminal act is also a substantial factor in bringing about the harm does not protect the actor from liability."

In the case at bar, as mentioned above, the breach by Dow and Certain-Teed both operated at the same time to bring about the injury suffered by Goslee.

The second step in the judicial determination of the existence of proximate cause amounts to a public policy consideration in which the court determines at what point an actor's liability for a particular act ends. Of this consideration the Court of Appeals in *Bloom v. Good Humor Ice Cream Co.*, 179 Md. 384, 18 A. 2d 592 (1941) stated, at 388:

"There is no definite and fixed rule whereby it can be determined which of several causes the law regards as sufficiently proximate, or too remote, to be the foundation of an action. That question must be determined by the peculiar facts and circumstances of the particular case."

Certain-Teed, citing *Bloom* and *Peterson v. Underwood, supra,* claims that it should be relieved of liability for its breach because it was merely passive or potential whereas the breach by Dow was the moving and effective cause of the injury. This argument ignores the evidence. Once again we point out that according to the testimony of Stafford, the injury suffered by Goslee would not have occurred at the time it did unless both Certain-Teed's and Dow's products had malfunctioned. The concurrence of both was a necessary pre-condition to the occurrence of the injury. It thus cannot be maintained that Certain-Teed's breach was passive or potential and thus not the proximate cause of Goslee's injury.

We therefore hold that the trial court was clearly justified in finding that the breach of warranty by Certain-Teed was the proximate cause of Goslee's injuries.

C. *Damages*

The trial court in assessing damages of $73,204.34 stated:

"To be as fair and just to all concerned as possible, we believe the true measure of damages for replacing subject roofs should not exceed the contract price for the original roofs, to wit: $64,000.00, to which should be added the sum of $9,204.34 for interest Goslee had to pay on the $50,000 it had to borrow to replace its working capital consumed in re-roofing subject roofs."

Certain-Teed claims that the $9,204.34 assessed as interest was improper because there was no evidence that "at the time of contracting [it] had reason to know" that it might be liable for such an amount. In effect Certain-Teed claims that the interest award was not foreseeable.

The proper measure of damages in breach of warranty situations are contained in Md. Code, Art. 95B, § 2-715 which provides:

"(1) Incidental damages resulting from the seller's breach include expenses reasonably incurred in inspection, receipt, transportation and care and custody of goods rightfully rejected, any commercially reasonable charges, expenses or commissions in connection with effecting cover and any other reasonable expense incident to the delay or other breach.

"(2) Consequential damages resulting from the seller's breach include

"(a) Any loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know and which could not reasonably be prevented by cover or otherwise; and

"(b) Injury to person or property proximately resulting from any breach of warranty."

The ascertainment of what are consequential damages was recently discussed by the Court of Appeals in *Addressograph-Multigraph v. Zink*, 273 Md. 277, 286, 329 A. 2d 28 (1974):

> "The allowance of incidental and consequential damages for breach of warranty finds its genesis in the rule of *Hadley v. Baxendale*, 9 Exch. 341 (1854) that damages which a plaintiff may recover for breach of contract include both those which may fairly and reasonably be considered as arising naturally from the breach (general damages) and those which may reasonably be supposed to have been in the contemplation of both parties at the time of making of the contract (special damages). *See Taylor v. Equitable Trust Co.*, 269 Md. 149, 159, 304 A. 2d 838, 844 (1973); *St. Paul at Chase v. Manufacturers Life Ins. Co.*, 262 Md. 192, 239-40, 278 A. 2d 12, 35 (1971); *Pennsylvania Threshermen & Farmers' Mut. Cas. Ins. Co. v. Messenger*, 181 Md. 295, 300-01, 29 A. 2d 653, 656 (1943); 5 A. Corbin, Contracts § 1011, at 83-87, § 1101, at 543-46 (1964); 11 S. Williston, Contracts § 1393, at 448-53 (3d ed. 1968).
>
> > "Restatement of Contracts § 330 (1932) provides:
> >
> > " 'In awarding damages, compensation is given for only those injuries that the defendant has reason to foresee as a probable result of his breach when the contract was made. If the injury is one that follows the breach in the usual course of events, there is sufficient reason for the defendant to foresee it; otherwise, it must be shown specifically that the defendant had reason to know the facts and to foresee the injury.' "

We find the interest award in the instant case sustainable

on two independent grounds. The first is that the interest paid was in fact a normal and thus foreseeable incident to Certain-Teed's breach of warranty. That a subcontractor, faced with the obligation to repair a defective roof as a result of the supplier's defective product will have to borrow the funds to finance such an undertaking and thus will have to pay interest on those funds is clearly an injury which follows in the "normal course of events" from the breach. The interest was thus recoverable under *Addressograph-Multigraph v. Zink, supra.* The second ground on which the award of interest was recoverable is that the trial judge in compiling damage awards has the discretion to allow interest on the amount awarded. The rule was lucidly stated by the Court of Appeals in *A. & A. Masonry v. Polinger,* 259 Md. 199, 269 A. 2d 566 (1970), where, quoting from *City Pass R. W. Co. v. Sewell,* 37 Md. 443 (1873), it held, at 203-204:

> " 'It must be conceded that interest is not an inseparable and invariable incident of claims for money, or unliquidated accounts. "It is recoverable as of right, upon contracts in writing to pay money upon a day certain; as upon bills of exchange and promissory notes, or on contracts for the payment of interest, or where the money claimed has been actually used, and upon bonds, etc., but in other cases, *it is a question entirely for the jury to be decided according to the equities of the transaction.*" Newson v. Douglass,* 7 H. & J. 417; *Karthaus v. Owings,* 2 G. & J. 430.' (emphasis in original) *Id.* at 452."

*See also Brown v. Bradshaw,* 245 Md. 524, 226 A. 2d 565 (1967), in which the Court in a suit by a landlord against his former tenant allowed interest to be assessed by the jury on the amount of money expended by a landlord to repair the leased premises. We see no difference between the trier of fact awarding interest paid on funds actually borrowed to make repairs, as in the instant case, and a situation such as in *Brown v. Bradshaw, supra,* where the trier of fact is

allowed to fix a reasonable amount of interest on funds used to make repairs.

## Dow's Appeal

### A. The Exclusion of Expert Testimony

At trial, the court refused to allow James Sheehan to testify as an expert on Dow's behalf. Dow makes an extended argument in support of its contention that said action was erroneous. We do not reach the question in that Dow at the time of the witness's exclusion did not make a proffer as to what he would testify. There is therefore nothing for us to review. Md. Rule 522 b. *Leitch v. Anne Arundel County*, 248 Md. 611, 237 A. 2d 748 (1968); *Hartsock v. Strong*, 21 Md. App. 110, 318 A. 2d 237 (1974).

Dow argues that it was prevented from making a proffer by the trial judge. We do not agree. After extended argument on the propriety *vel non* of the witness's exclusion, the trial judge ruled and stated, "There is nothing more to be said, Mr. Wood [Dow's Attorney]. I have ruled . . ." It is pellucid that this statement was intended merely to terminate argument on the Motion to Exclude and not to prevent Dow from making a proffer to preserve the question for appeal.

### B. The Responsibility of Goslee to Repair the Roofs

Dow next contends that as Goslee had no legal obligation to make the repairs, it was a mere volunteer and is thus not entitled to recoup the expenses as damages. Whatever merit that argument might have in another context, it has none here.

The requirements for legal subrogation were set out in *Schnader, Inc. v. Cole Building Co.*, 236 Md. 17, 23, 202 A. 2d 326 (1964):

> ". . . the essential elements necessary for legal subrogation . . . are: (1) the existence of a debt or obligation for which a party, other than the subrogee, is primarily liable, which (2) the subrogee, who is neither a volunteer nor an

intermeddler, pays or discharges in order to protect his own rights and interest."

A case closely analogous to the instant case is *Ragan v. Kelly*, 180 Md. 324, 24 A. 2d 289 (1942). There, just prior to his death, the deceased had his niece's name added to his savings account. She thereupon withdrew some money from the account to pay hospital bills. After the deceased died, she withdrew another sum to cover funeral expenses and a doctor's bill. The deceased's administrator sued the niece for the money expended after his death claiming that it was a part of the estate. The Court of Appeals held that the niece was not accountable for the money and stated at 335:

> "While technically she should account to the administrator for money spent after Mr. Kelly's death, under all the circumstances it would be a great injustice to require her to do so. Since she paid only just and reasonable bills, which the administrator would have been compelled to pay, and out of the very same fund, she should be subrogated to the rights of the undertaker and the doctor in the settlement of the estate, and, in her accounting to the administrator, a credit should be allowed her equal to the full amount of money so expended from the $1,500 withdrawn.
>
> "Subrogation always will be granted when an equitable result will be obtained. 60 C. J., Sec. 22, p. 709. Payments made in ignorance of real facts cannot be said to be voluntary. A person who has paid a debt under the colorable obligation to do so, or under an honest belief that he is bound, or who mistakenly but in good faith believes he is liable, will be subrogated. 60 C. J., Sec. 27, on page 719, also Sec. 36, on page 725.
>
> "This is not a case of a mere volunteer, who, without any duty, moral or otherwise, pays the debt of another, but it is a case of a person intrusted with a special duty, who, in the

discharge of that duty, pays debts she honestly thought she should pay. In a case like this she is entitled to be subrogated to the rights of those whose claims have been paid."

In the instant case the elements of subrogation detailed above are present. We have found that both Dow and Certain-Teed were liable for any damages caused by the leaking roofs. Goslee by re-roofing the buildings at its own expense in effect discharged the liability Dow and Certain-Teed had to Chesapeake College. It is clear that had Goslee not done so Chesapeake could have recovered from Dow and Certain-Teed. It is likewise clear that Goslee was neither a volunteer nor an intermeddler. It was a party to the original contract to buy the goods from Dow's agent and Certain-Teed. It also was very much concerned, as the testimony shows, that its good business name be upheld in the area. The actions of Goslee, like those of the niece in *Ragan v. Kelly, supra,* were reasonable and taken in good faith; to deny Goslee relief from the costs of those actions would be inequitable. *Schnader, Inc. v. Cole Building Co., supra,* holds the doctrine, in Maryland, applies in law as well as in equity.

We, therefore, find that Goslee was subrogated to the rights of Chesapeake and that an award was proper.

### C. *Damages*

Goslee's subcontract with Brohawn was at the agreed price of $64,000.00. Goslee's cost to re-roof was $50,442.01. As discussed above the trial judge awarded Goslee $64,000.00 for the re-roofing which he felt represented cost plus reasonable profit and refused to allow additional claims for lost profits.

We treat under this heading the contentions of Dow and Certain-Teed that the above award was not proper. They argue that Goslee should not be allowed to profit twice from the same contract and that the damages should have been limited only to the cost of re-roofing.

The action of the trial judge was in effect an award of anticipated or lost profits to Goslee due to its having to use

its employees and equipment to repair the leaks caused by appellant's breach rather than on other jobs.

The general rule regarding the recovery of anticipated profits was recently explained in *Macke Co. v. Pizza of Gaithersburg, Inc.*, 259 Md. 479, 270 A. 2d 645 (1970), where the Court stated, at 488-489:

> "Under the concept of 'foreseeability' enunciated by *Hadley v. Baxendale*, 9 Ex. 341, 156 Eng. Rep. 145 (1854), which was followed in *United States Telegraph Co. v. Gildersleve*, 29 Md. 232 (1868), in order to recover unrealized profits a plaintiff had to show that the breach of contract caused the loss and that the loss of profits was in the contemplation of the parties and the probable result of a breach. Some of the early American cases superimposed a test of certainty on the concept of foreseeability. See, for example, *Griffin v. Colver*, 16 N. Y. 489, 69 Am. Dec. 718 (1858), which was cited with approval in *United States Telegraph, supra.*

> "In the last hundred years, however, courts have modified the rule that anticipated profits were not an element of damages because of their inherent uncertainty, see 'Speculative Profits as Damages for Breach of Contract,' 46 Harv. L. Rev. 696 (1933), and have turned from the requirement of 'certainty' to a more flexible test of 'reasonable certainty.' See Restatement, *Contracts* § 311 (1932); 11 *Williston on Contracts* § 1345 (3d ed. 1968) at 231; 5 *Corbin on Contracts* § 1020 (1964) at 124.

> "This Court, speaking through Judge Horney in *M & R Contractors & Builders, Inc. v. Michael, supra*, 215 Md. 340 said:

>> 'Courts have modified the "certainty" rule into a more flexible one of "reasonable certainty". In such instances, recovery may often be based on opinion evidence, in the legal sense of that term, from which liberal

inferences may be drawn. Generally, proof of actual or even estimated costs is all that is required with certainty.

'Some of the modifications which have been aimed at avoiding the harsh requirements of the "certainty" rule include: (a) if the fact of damage is proven with certainty, the extent or the amount thereof may be left to reasonable inference; (b) where a defendant's wrong has caused the difficulty of proving damage, he cannot complain of the resulting uncertainty; (c) mere difficulty in ascertaining the amount of damage is not fatal; (d) mathematical precision in fixing the exact amount is not required; (e) it is sufficient if the best evidence of the damage which is available is produced; and (f) the plaintiff is entitled to recover the value of his contract as measured by the value of his profits. *McCormick, Damages*, Sec. 27 (1935).' at 348-49."

*Auto Retailers v. Evans Cig. Service*, 269 Md. 101, 109-110, 304 A. 2d 581 (1973).

In the instant case, William Schwartz, Goslee's president, testified that the estimated value of the lost time resulting from the re-roofing was $15,000.00. He added that that amount was not duplicated in any of Goslee's other damage estimates. Schwartz was asked, based on his knowledge of the records and operation of Goslee over the period of years he was managing officer, (22), whether Goslee had sustained a loss of or a reduction in its "normal average, anticipated profit by reason of the events and circumstances which were the subject of this case." To this he answered that Goslee had lost $15,000.00.

"The men we sent up there to do the corrective work could have been working on contracts we already had, and here we were up there making or taking care of leaks and repairing the roof, where they could have been out working on contracts that

we already had and I figured that we had lost $15,000.00 in this corrective work."

Added to this testimony are the admitted facts that the original contract of the roofing project was for $64,000.00 and that the cost of re-roofing was $50,442.01.

In light of this evidence we find that the amount of profits lost by Goslee as a result of the appellants' breach was proved with reasonable certainty and that the award by the trial judge was not clearly erroneous. Md. Rule 1086.

### Goslee's Cross-Appeal

In its cross-appeal Goslee raises several contentions all relating to the amount of damages allowed by the trial court.

Goslee first contends the trial judge should have allowed as consequential damages the cost of its first attempt to repair three of the roofs in question ($7,464.00) by reflooding those roofs with asphalt. The trial court refused to include said amount and stated:

"We do not believe that the charge for reflood-coating the first three roofs should be allowed, since, as near as we can determine from the record, it was undertaken by Goslee without having made any substantial investigation to determine the real cause of the roof failures and without the recommendation of any of the other parties involved."

Under Art. 95B, § 2-714 and § 2-715 in order to recover for incidental and consequential damages, it must be shown that the expense incurred was reasonable. Our review of the transcripts and exhibits leads us to conclude that the reflooding expenses incurred by Goslee, without advice from either Dow or Certain-Teed, were not reasonable and that the trial judge was not clearly erroneous in refusing to allow it as part of Goslee's damages.

Goslee also contends that the estimated travel expenses of its employees ($2,000) incurred as a result of the complaints

from Chesapeake College should have been included in its damages. The estimate, given by William Schwartz, president of Goslee, was not particularized in any way. Schwartz stated merely that he had to send men and trucks to Chesapeake College on numerous occasions and that he paid the men for their time. The trial judge, apparently because Goslee had failed to sufficiently establish the amount incurred, did not allow the amount as damages. This finding was also not clearly erroneous.

Goslee also argues that litigation expenses should have been awarded as damages. These items, totaling $3799.46 include: $1500.00 paid to Penneman & Brown for laboratory testing, $650.00 paid to Goslee's expert and $1649.46 "advanced by [Goslee's] attorney for depositions and other expenses."

The rule in Maryland regarding the recovery of litigation expenses was recently stated in *Empire Realty Co. v. Fleisher*, 269 Md. 278, 305 A. 2d 144 (1973), where the Court stated at 285-286:

> "The general rule is that, other than usual and ordinary court costs, the expenses of litigation — including legal fees incurred by the successful party — are not recoverable in an action for damages, *Freedman v. Seidler*, 233 Md. 39, 47, 194 A. 2d 778 (1963); *Harry's Tavern, Inc. v. Pitarra*, 224 Md. 56, 63, 166 A. 2d 908 (1961); *McGaw v. Acker, Merrall & C. Co.*, 111 Md. 153, 160, 73 A. 731 (1909); 1 Sedgwick, *Damages*, § 229 (9th ed. 1912)."

The trial court thus properly excluded the above-mentioned litigation expense.

Goslee also contends that the trial court should have awarded it $5000.00 as "loss of good will or loss of anticipated profit on Marion School contract lost due to Chesapeake College roof failures." The complete answer to this contention is that the record is devoid of sufficient proof connecting Goslee's loss of the contract with the Chesapeake roof failure.

Goslee's final contention is that the trial court should have

included in the award the $450.00 purchase price of a machine it bought, at the appellant's suggestion, for the Chesapeake College project. The machine could not be used on that job. Goslee, however, failed to prove the value of the machine at the time of trial. The purchase price was therefore properly rejected as a measure of damages.

*Judgments affirmed.*
*Appellants to pay costs.*